## UNITED STATES v. COLE.

### No. 5618.

Circuit Court of Appeals, Seventh Circuit.

March 18, 1936.

Armistead L. Boothe, of Washington, D. C., James R. Fleming, U. S. Atty., of Fort Wayne, Ind., Luther M. Swygert, Asst. U. S. Atty., of Hammond, Ind., Will G. Beardslee, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to the Atty. Gen., and J. Gregory Bruce, Atty., Department of Justice, of Washington, D. C., for the United States.

Clarence E. Benadum, of Muncie, Ind., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BALTZELL, District Judge.

EVANS, Circuit Judge.

This action was brought to recover benefits upon a war risk insurance policy, for alleged total and permanent disability. The complaint was filed December 28th, 1931. The jury found that appellee became totally and permanently disabled on September 15th, 1919. Judgment was afterwards rendered upon the verdict.

It is the contention of appellant that there was no substantial evidence to support the verdict, and, that therefore, the District Court erred in overruling its motion for a directed verdict. The other error arises over the admission in evidence of the opinion of medical experts as to the inability of appellee to perform work of any kind, and that his physical condition, as they found it, upon examination, is permanent.

Appellee entered the military service on the 29th day of April, 1918, and was honorably discharged therefrom on the 5th day of September, 1919. There was issued to him a war risk insurance certificate in the amount of $10,000, on which premiums were paid until his discharge. The insurance was in force until October 31, 1919. The question first to be determined is whether there is evidence to support the jury's verdict that appellee was totally and permanently disabled prior to the lapse of his insurance contract.

Prior to the time he entered the military service, appellee did general farm work. He was sent to France, where he saw active service and was continuously under fire for a considerable length of time. Without discrediting his testimony in the least, it appears that he was neither injured nor in a hospital while in the service, which facts are supported by the records of the War Department. Furthermore, at the time of his discharge, he signed a statement that he was not suffering from injury or disease of any kind, which statement was attested by his commanding officer. The Adjutant General's records also disclose that, prior to his discharge, he was examined by a medical officer, in whose certificate it is stated that he was found to be physically and mentally sound.

Within a few days following his discharge he went to the home of a brother-in-law in Kentucky, where he made his home until February, 1921. He testified that, on going there, he was treated by Dr. McGinnis for some physical disability, and was cared for by his sister. Dr. McGinnis, according to the evidence, is alive and practicing his profession in Kentucky, yet he was not called as a witness nor was his deposition offered. An effort was made to read in evidence a statement made by Dr. McGinnis as to the physical condition of appellee during the time he treated him, but such statement was excluded. Appellee was also treated by Dr. Ollie Brown, of Akers, Kentucky, prior to appellee's admission to the Sanitarium at Marion, but the record is silent as to the condition in which Dr. Brown found him.

While it is true that only a small amount of work was done by appellee during the time he lived with his brother-in-law, yet, there is a complete absence of any medical evidence bearing upon his physical condition during that time. He and his brother-in-law were in partnership in the raising and harvesting of a tobacco crop during the winter of 1919 and the summer of 1920. Both testified that he was unable to do very much work.

Appellee was admitted to the Government Sanitarium at Marion, Indiana, on February 17th, 1921, and remained there until December 14th, 1930, at which time he was released at his own request. He was permitted to absent himself therefrom for short periods of time. While an inmate, he did some work in the Occupational Preparation School, making leather pocketbooks. There is practically no evidence as to his physical condition during the time he was such inmate, and especially during the first few years. Dr. Dennis J. Murphy was in charge of the Admission Department of such institution at that time, but his testimony fails to disclose the condition of appellee's health. He did testify, however, that an examination of appellee just prior to his discharge from the institution revealed an enlarged thyroid gland, some mild tremors of the fingers, dizziness, and pains around the heart. The primary diagnosis was cerebro spinal syphillis, and the secondary diagnosis was exopthalmic goitre mild. Dr. Charles F. Davis, a specialist in psychiatry, an associate of the institution, became acquainted in 1925 with appellee, who was under his supervision from that time until January, 1929, and he saw appellee on an average of once or twice a day. Appellee was suffering with cerebro spinal syphillis at the time Dr. Davis began treating him. Much improvement was manifested upon treatment for that disease. In 1929, it was found that his blood and spinal fluid were inactive, and that there had been much improvement clinically. He had largely rid himself of his marked nervous instability, had gained in weight, and was greatly improved, at the time of his discharge from the institution.

All of the medical testimony, with the exception of that of Doctors Murphy and Davis, relates to the condition of appellee subsequent to his discharge from the sanitarium, and several of the doctors testifying examined him for the purpose of giving testimony at the trial, and not for the purpose of treatment. All of these witnesses, with the exception of Dr. E. O. Harred, who saw him the first time during the month of March, 1931, examined him after the filing of the complaint herein. Their testimony sheds light upon his physical condition at the time of such examinations, but is of little assistance to a court in determining his condition twelve to fifteen years prior thereto. It is a well known fact, in medical science, that the primary disease with which appellee was and is suffering is progressive, and that a patient so afflicted may be able to work and gain a livelihood for many years.

Dr. E. O. Harred, a physician of Marion, examined appellee first in 1931 and subsequently thereto. His first diagnosis was that of exopthalmic or toxic goitre, but afterwards concluded that it was more of a neurological problem, apart from goitre. Dr. James C. Ross, a physician of Marion, examined appellee the first time on May 6th, 1932, having known him only a short time prior thereto. He again examined him on January 9th, 1933. Upon a more careful examination, he was found to be suffering from the effects of an exopthalmic goitre. He was very nervous. In order to make comparisons, Dr. Ross examined him again on February 2nd, 1935, and taking into account the physical findings on each examination, he expressed the opinion that appellee's condition was not of a recent origin, but could not answer as to its duration prior to his first examination. Dr. L. Potter Harshman, a physician of Fort Wayne, was a specialist in mental and nervous diseases. He examined appellee on January 27th and 30th, 1933. His examination was thorough, especially as to his mental and nervous condition. His physical finding was that appellee had a slight toxic thyroid and further that appellee was a neurocirculatory asthenic. Dr. Charles A. Sellers, a physician of Hartford City, examined appellee the first and only time on Friday, prior to the commencement of the trial, and for the purpose of qualifying himself to testify therein. He described in detail the nature of the examination, and concluded that appellee was suffering from Graves' disease or exopthalmic goitre. Graves' disease affects the central nervous system and is incurable, according to Dr. Sellers' testimony. Dr. John C. Vaughan, a physician of Marion, examined appellee

on the day before he testified as a witness in this case, and for the express purpose of testifying. After giving the details of the examination, he concluded that appellee is suffering from "shell shock" and defines that term as being "anything that brings on a shock that is enough to upset a person's nervous system, throw it out of gear so that they are never able to get it back." Dr. Harold E. Kaylor, a physician of Bluffton, examined appellee on February 1st and 2nd, 1935—only a few days before the commencement of the trial. His examination was very thorough and complete, and his diagnosis was that of neurasthenia.

Each of the above medical experts was permitted, over objection of appellant, to testify, in substance, that appellee, at the time of examination, was unable to work at a gainful occupation in the competitive world and that his condition is permanent. While these various opinions were not as to his condition on September 15, 1919, they were expressions upon the ultimate fact to be decided by the jury and are objectionable. Their admission constituted error. United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617; United States v. Sparks (C.C.A.7th) 80 F.(2d) 392; United States v. Stephens (C.C.A.9th) 73 F.(2d) 695; United States v. Price (C.C.A.5th) 77 F.(2d) 345; United States v. Sampson, (C.C.A.9th) 79 F.(2d) 131.

There were six lay witnesses, aside from appellee's brother-in-law, who testified as to their acquaintance with appellee and their observation of him as to his physical condition during the time of such acquaintance. While the testimony of laymen, as to the physical condition of an individual with whom they are associated, is competent, yet, in the instant case, it is particularly significant that none of the lay witnesses knew appellee, according to their own testimony, until long after his insurance contract had lapsed. Some of such witnesses had known him for only three or four years prior to the date of the trial, while others had known him from eight to twelve or fourteen years prior thereto. Obviously, their testimony as to their observations of him can be of little assistance to the court in determining his condition on September 15, 1919.

The question was of course not whether appellee was totally and permanently disabled on the date of the trial, but what was his condition in 1919 almost sixteen years earlier. That appellee was at least partially disabled for several years prior to the date of the trial, there can be no doubt.

Our conclusion is that giving the testimony a construction most favorable to appellee, it falls short of establishing total and permanent disability at the time the insured ceased paying premiums, to-wit, September 15, 1919. Over it no jury question was involved. Appellant's motion for a directed verdict should, therefore, have been sustained.

The judgment of the District Court is reversed with direction to grant a new trial.