## COLE v. UNITED STATES.
### No. 7735.

Circuit Court of Appeals, Seventh Circuit.
April 8, 1942.

Thomas E. Walsh, Benjamin F. Schwartz, Julius C. Martin, and Wilbur C. Pickett, all of Washington, D. C., Alexander M. Campbell, of Fort Wayne, Ind., and Luther M. Swygert, U. S. Atty., of Hammond, Ind., for appellant.

Clarence E. Benadum, of Muncie, Ind., for appellee.

Before EVANS, SPARKS and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This is an appeal from a judgment, entered February 6, 1941, in favor of the plaintiff, allowing recovery of total permanent disability benefits under a contract of War Risk Insurance. This is the second appeal in this case, a former appeal having resulted in the reversal of a judgment in favor of plaintiff, with directions to grant a new trial. United States v. Cole, 7 Cir., 82 F.2d 655. In that appeal we held defendant's motion for a directed verdict should have been allowed for lack of substantial evidence to establish total and permanent disability at the time insured ceased to pay premiums, and also that the court erred in the admission of medical testimony which invaded the province of the jury.

It was stipulated that plaintiff was inducted into the military service April 29, 1918, and was discharged therefrom on September 5, 1919; that on May 12, 1918, he applied for and obtained a $10,000 policy of Wark Risk Insurance on which premiums were paid to include the month of September, 1919; that the grace period expired at midnight October 31, 1919; and that claim for insurance benefits, filed by the plaintiff on May 21, 1931, was denied

before the present suit was instituted on December 28, 1931.

At the close of the evidence, a motion for directed verdict, made by the Government, was denied. The only contested issue here is the alleged error of the court in the denial of such motion. It is argued here, as it was in the court below, that the evidence on this trial is not materially different from that at the former trial, that our previous decision constitutes the law of the case, and that the record evidence is wholly inconsistent with plaintiff's claim of total and permanent disability.

While the evidence in this case is similar to that adduced at the former trial, yet in some respects it is different and we are convinced furnishes stronger support for plaintiff's case. Furthermore, in the instant case, no question is raised other than the one stated. We must assume, therefore, that the jury considered only competent evidence and that it was properly instructed as to the applicable law. While our former decision is persuasive, we do not believe it is controlling on the instant appeal.

The rule to be applied in determining the question before us was stated in Lumbra v. United States, 290 U.S. 551, 553, 54 S.Ct. 272, 273, 78 L.Ed. 492, as follows: " * * * And, for its decision, we assume as established all the facts that the evidence supporting petitioner's claims reasonably tends to prove and that there should be drawn in his favor all the inferences fairly deducible from such facts. * * * " In reaching a solution of the question presented, we think we should give some heed to the fact that the cause has again been tried before the same judge who tried the former case, who twice has concluded that the evidence was sufficient to justify its submission to the jury, and that twice a jury has decided in favor of the plaintiff. We are of the view that defendant's contention must be denied unless there are undisputed facts which so completely negative plaintiff's contention as to make it incredible. In other words, the inferences which may be fairly deducible from the facts, as related by the plaintiff and other witnesses, are sufficient in support of plaintiff's claim unless such inferences have been destroyed by undisputed facts upon which the Government relies.

Briefly, plaintiff served in the Argonne Forest campaign from the 23rd of July, 1918, until the date of the Armistice. Most of that time he was under machine gun and shell fire. By explosion and shock he was rendered unconscious on numerous occasions. Sometimes he was unconscious for as long as twenty-four hours. At times he was unable to recognize his officers. His mind would come and go, and he developed a highly nervous condition due to shell shock. He received his fourth shock on the day before the Armistice was signed and became unconscious. Afterwards, he found himself covered with dirt and mud in an old building, without knowing how he got there. He had almost constant headaches and his mind did not function properly. According to his testimony he worked regularly as a farm hand previous to his induction into military service, but has been unable at all times to follow any gainful occupation from the date of his discharge to the present time. His work record is practically nil. There is no doubt but that plaintiff has been under the care of physicians continuously from two or three days after his discharge from the service to the time of the trial. More than a score of doctors have treated him.

There is little, if any, question in our mind but that there was ample proof of plaintiff's total and permanent disability subsequent to 1930. Both lay witnesses and medical witnesses make that fact reasonably certain. He was nervous, had pains in his head, fainting spells and a trembling of the hands. His condition was variously diagnosed as neurocirculatory asthenia, constitutional inadequacy, neurosis, over-active thyroid, exophthalmic goitre and Graves' disease, a disease of the central nervous system. A number of doctors who treated him during this period testified that his condition was permanent, chronic and incurable. Also that he was unable to do any kind of physical labor or to follow any gainful occupation.

As pointed out in our former opinion, however, the total and permanent disability must have had its origin prior to the lapse of the insurance policy in suit. The critical period is that from discharge until about 1930. It is earnestly insisted by the Government that the undisputed facts destroy any probative effect which might be given to plaintiff's claim. The doctor is dead whom plaintiff consulted within two or three days of his discharge and

who attended him regularly until about February 17, 1921. On the latter date plaintiff was admitted to the Government Sanitarium at Marion, Indiana, an institution for the treatment of nervous and mental diseases, where he remained continuously until December 14, 1930. Numerous reports and records were introduced (not introduced at the former trial) covering plaintiff's condition from January 22, 1921, until the date he was discharged from the Marion Sanitarium. In a report dated January 22, 1921, the diagnosis was Exophthalmic goitre. February 21, 1921, the same diagnosis was made. January 31, 1923, the diagnosis, in addition to Exophthalmic goitre, was Cerebral Spinal syphilis. The same diagnosis was made in 1925 and 1926. On January 24, 1927, the report discloses "this patient has made very little change either mentally or physically during the course of the past month." The reports disclose that the patient was "cooperative, attends vocational school and prescribed exercises." On March 5, 1929, the diagnosis was "Cerebral Spinal Syphilis in a state of remission, Hyperthyroidism—mild, Psoriasis—mild, Ptyergium, both eyes—mild," and on December 14, 1930, "Cerebro-spinal Syphilis and Exophthalmic goitre." One physician connected with the Sanitarium, and who had supervision of plaintiff from September, 1925 until December, 1929, stated: " * * * It is my opinion that the plaintiff could have performed some light clerical type of work, but in view of his emotional instability and fixation on himself, as evidenced by these physical complaints and depressed episodes, he could not, in my opinion, have stood up under work requiring marked stress or strain emotionally."

As pointed out, plaintiff was maintained and treated continuously in a Government Sanitarium for almost ten years. It is a significant circumstance, so we think, that during all these years, so far as is shown, plaintiff was neither asked nor taught to do any kind of work except the making of a few pocketbooks, although vocational training was provided for in the Sanitarium. This circumstance is more consistent with the plaintiff's claim that he was unable to work than with the Government's claim that he was. Also, it is not inconsistent with plaintiff's contention that his condition, upon entry to the Sanitarium, had existed from the time of his service.

As stated, his work record is almost nil. In the winters of 1919 and 1920, he was interested with his brother in growing tobacco. At most he worked only a few days for which he received a compensation of $30. After his discharge from the Sanitarium, he engaged in the coal business for a period of thirty days and lost $25. In 1936, he purchased a lunch room and, after three weeks, transferred it to a woman whom he afterwards married, with an arrangement that she was to furnish him his meals. There is some evidence that he ordered meats and supplies for the restaurant. A Special Agent of the Bureau of Investigation was assigned to investigate the case in the fall of 1940, the result of which is more significant in what his report does not disclose than what it does. Plaintiff's work record, as disclosed by his investigation, was to the effect that on one occasion the Special Agent saw plaintiff sitting at the restaurant counter reading a newspaper; on another occasion he saw him in the kitchen placing food on plates, and on the third occasion, which was just before Christmas, he was seen putting lights on a Christmas tree. If an investigator could discover no more of a work record than this, it is reasonable to conclude that there was none. Thus, instead of contradicting the plaintiff, it has a tendency to corroborate him.

It is also pointed out that subsequent to the Armistice and before plaintiff was discharged, he was assigned to do police duty. What his duties were in this respect is not disclosed and is of little importance. More material, however, is that plaintiff, at the time of his discharge, signed a statement that he was not suffering from injury or disease of any kind, and the certificate of the medical officer who examined him at that time stated he was physically and mentally sound. The effect of these statements and examination, however, is considerably weakened by the fact that plaintiff was, subsequent to his discharge, rated as disabled and awarded compensation from October 6, 1919—in other words, from the date of his discharge.

The Government introduced in evidence an exhibit (not introduced at the previous trial) which disclosed that plaintiff, between September 6, 1919 and March 28, 1934, was paid a total of $17,433.61 for service-connected disability. This evidence was introduced, so it is said, for the purpose of showing that plaintiff had money and that there was no incentive for him

to work. In other words, to account for the lack of a work record. From February 18, 1921 (the date plaintiff entered the Sanitarium), plaintiff was allowed compensation at the rate of $80 per month until December 31, 1922, when it was increased to $90 per month. Such rating was continued until May 25, 1925, when it was increased to $100, which continued until June 30, 1933, when it was decreased to $75. This latter rating continued until April 30, 1936, when his compensation award was discontinued. The award indicates that he was rated, at least a part of the time, as totally disabled. While this compensation award, in itself, carries no great weight, yet we think it is another circumstance which affords some support to plaintiff's claim. Certainly it is a recognition on the part of the Government that he was disabled from the time of discharge until the time when the compensation payments were discontinued.

It is also pointed out that plaintiff, since his discharge, was married, divorced and remarried. That might indicate he was sadly in need of a conservator, but we doubt if it has any bearing on the issue presented.

As already stated, we think plaintiff's medical testimony shows that he was totally and permanently disabled subsequent to about the year 1930. The facts that he was continuously under the care of physicians subsequent to his discharge from service, that he was awarded disability compensation from the date of such discharge; that he was a charge of the Government for almost ten years, and that during the time from discharge until trial he worked at no gainful occupation, are all circumstances which tend to corroborate rather than contradict plaintiff's claim of total and permanent disability.

While we concede the question is close, we are not convinced but that the court properly submitted the issue in controversy to the jury.

The judgment is therefore affirmed.

EVANS, Circuit Judge (dissenting).

I dissent for two reasons: (a) The evidence in this case, similar to the evidence in the previous case, not only fails to furnish support for a finding of total and permanent disability on September 15, 1919, but conclusively shows plaintiff was not thus disabled. (b) The law of the case required the District Court to follow the decision of this court (82 F.2d 655) and direct a verdict in defendant's favor.

The War Risk Insurance Act evidenced an appreciative sentiment on the part of the Government towards the veterans of the World War. It was intended to, and did, provide generous treatment for them. While in no way connected with the more generous treatment of the sick and disabled veterans, it was inspired by the same motive. The policy, which it issued to each veteran, provided for the payment of $10,000 in case he was totally and permanently disabled. No premium payments were required during the insured's total disability.

With such generous treatment, we are all, no doubt, in full sympathy. But such a policy does not require, nor permit, courts to change or enlarge their functions. They are not authorized by the Government to make contributions to veterans. Their duties are the same as in other cases,— to study the facts and apply the law. To be specific,—to ascertain whether, in September, 1919, plaintiff was totally and permanently disabled. And to be still more specific, to inquire if there is any evidence which would sustain a verdict or finding that plaintiff was, on September 15, 1919, totally and permanently disabled.

The facts are fully stated in the opinion upon the previous appeal. United States v. Cole, 7 Cir., 82 F.2d 655. Plaintiff's policy expired for non-payment of premiums on September 15, 1919, unless he was at that time totally and permanently disabled.

As to his physical state on that date, three witnesses gave positive testimony in writing. One was the plaintiff. One was plaintiff's captain. One was a doctor, the Major in the Army who examined plaintiff.

On the date of his discharge in September, 1919, plaintiff was asked concerning his physical and mental condition, and in writing he made the following statement:

"Question. Have you any reason to believe that at the present time you are suffering from the effects of any wound, injury, or disease, or that you have any disability or impairment of health, whether or not incurred in the military service.

"Answer. No."

This statement was duly witnessed.

At the same time plaintiff was examined by Major J. L. Haskins of the U. S. Army, who, in writing, stated:

"I certify that the soldier named above has this date been given a careful physical examination, and it is found that he is physically and mentally sound. In view of occupation he is non per cent disabled."

Upon such written statements plaintiff was honorably discharged. In the discharge, he and his captain, in writing, made the following statement:

"Wounds received in service: None * * *

"Physical condition when discharged: Good."

This testimony is not contradicted nor disputed. No other witness testified as to his condition on that date.

Nor has there been any attack on the integrity or verity of any of these statements. No mistake, no misrepresentation, no fraud in their preparation or execution is charged or intimated.

Notwithstanding this fact, we are asked to repudiate all three statements. More, we are asked to find that, at said time, when the plaintiff, his captain, and his doctor were all convinced that he was in good health—was physically and mentally sound—plaintiff was in fact *totally and permanently* disabled.

Quite impossible did this seem to me in 1936, when, speaking for this court as then constituted, we held a verdict that plaintiff was totally and permanently disabled could not stand. Speaking for myself, only, I again say that it is equally impossible to reconcile a verdict of total and permanent disability with these solemn, undisputed, and unchallenged statements of sound body and mind, made in 1919, when personal and financial interests were absent.

The testimony, upon which the action of the court in sending the case to the jury and the verdict, itself, must rest, came from several doctors who are quite well agreed as to the causes of plaintiff's condition as they found it in *the last ten years* of his life.*

Our study must be confined to plaintiff's physical condition in September, 1919. In order to locate dates and ascertain causes, however, I have studied the medical record made subsequent to 1919. The doctors seemed to agree that his condition in the '30s was due to two specific causes: (a) cerebral spinal syphilis; (b) exophthalmic goitre.

There is some reference at times to enlargement of thyroid glands. The thyroid gland is here mentioned because it appears in the doctor's report, but it does not seem to have had much, or any, acceptance by the medical witnesses as the cause of plaintiff's later condition. Most important, and certainly equally important as all other causes, was the syphilitic condition of plaintiff. The treatment therefor was extensive. At times there was improvement in this respect, but later examinations disclosed its aggravation and further efforts were made to overcome it.

There was no evidence to show that plaintiff suffered from this cerebral spinal syphilis before 1921. The year 1921 also fixes the first date when the exophthalmic goitre was discovered. More pronounced were both in the '22, '23, and '24 reports. The causes of plaintiff's troubles in '23 and '24 were cerebral spinal syphilis and exophthalmic goitre. These facts are based on the contents of reports of doctors and hospital records where plaintiff received medical treatment.

To set forth the other evidence which consisted largely of testimony of laymen who met plaintiff anywhere from thirteen to sixteen years after his discharge, would be unwarranted. From their statements it could be said there was possibly a question as to plaintiff's total disability in the '30s, but surely the testimony had no bearing on his condition in 1919.

I am convinced that plaintiff's present condition (whether it be a total or a partial disability) is traceable to the syphilitic condition and to a lesser degree to the goitre. There is no evidence that plaintiff had either syphilis or an exophthalmic goitre in 1919 when he, his captain, and his major gave their free, voluntary statements, that he was sound and free of all disabilities. Even had he then suffered from syphilitic symptoms and failed to disclose them to his captain or to his doctor, it must be apparent they were not of the extent which justified a finding of total disability. Nor could they be defined as totally disabling, when he worked the

* Whether he was totally and permanently disabled in 1939 or even in 1931 when he married his second wife, or in 1935, when he engaged in the restaurant business, is quite outside the question which confronts us.

following winter on the farm for $60 a month and later for $45.

*Law of the Case.* For another reason, the court should have directed the verdict in defendant's favor. Instead of following the "law of the case" the District Court submitted the case to the jury on substantially the same evidence as was received on the first trial.

The law of the case is founded upon the desire for, and the necessity of, a final determination of litigation. If the appellate court reverses the District Court, and the District Court refuses to follow the ruling of the appellate court, litigation would be interminable.

It must be admitted that in cases like this, and many other situations, the District Court may well believe that his decision is more sound than that of the court which reverses him. He is entitled to that opinion. Nevertheless, orderly procedure requires that he accept the conclusion of the appellate court when, for a second time, the case is before him. There is a condition or proviso attached to this rule, which I have no doubt the District Court believed to be applicable, namely,— it does not govern unless the evidence on the second trial is the same, or substantially the same, as on the first trial.

A good statement of the "law of the case" is set forth in 15 Ruling Case Law, page 959.

"* * * Thus a decision on a former appeal, that the evidence was insufficient to overthrow a will, may become the law of the case upon those facts, and if the evidence is substantially the same upon a retrial of the cause, the question as to the validity of the will becomes *res judicata. The mere addition of new matter to a pleading, or to the body of the evidence, is not sufficient* to avoid the rule as to the law of the case. An amendment to the pleading or the introduction of new evidence, to escape the operation of the rule, must be such as to present a new and substantial change in the facts before the court."

For like holdings, see Johnston v. Jones, 1 Black. 209, 17 L.Ed. 117; 34 L.R.A. note, page 332; International Brotherhood of Elec. Workers v. Western Union Tel. Co., 7 Cir., 46 F.2d 736; Nat. Brake & Electric Co. v. Christensen, 7 Cir., 38 F.2d 721; 5 Corpus Juris Secundum, Appeal and Error, § 1821, p. 1267.

As I view it, there was practically no substantial difference in the testimony *as to plaintiff's 1919 condition* on the two trials. Such difference as occurred would still require the application of the law of the case, for it was restricted to witnesses who saw plaintiff for the first time in the '30s. Briefly stated, the differences were as follows: On the second trial there was testimony that after the Armistice, plaintiff was made a member of the military police which, according to the undisputed testimony, consisted of *picked men.* Instead of tending to show more disability shortly before his discharge, this would tend to show greater fitness and a better physical condition than was enjoyed by the average soldier.

Four laymen also testified. One met him eighteen years after his discharge. Another met him seventeen years after; a third, twelve years after, and a fourth, six years after his discharge.

Two of the witnesses were meat and grocery salesmen. Each was selling goods to the plaintiff or plaintiff's wife. One said the plaintiff never complained to him of poor health or sickness. The third witness was his second wife, whom he met in 1931. He married his first wife in 1922. The other witness, who saw him as early as 1926, gave no testimony which would hurt or help either side.

In addition there was a Dr. John C. Vaughan. He stated he first saw the plaintiff the second of February, 1941, or twenty-two years after his discharge. In addition to being a surgeon, he qualified by saying he "worked on ranges, punched cattle, drove pack trains, mushed dogs, worked in mines, lumber camps, and ordinary work a person does in hoboeing around the western country twenty or thirty, forty years ago. I was brought up at sea and knew something then about a sailor's routine aboard ship." He stated, "My conclusion is that he is shell shocked. That is a broad term but it is a term that is used."

In another respect—the absence of certain testimony—the two trials were alike. Plaintiff stated he was treated in 1919 by Dr. McGinnis. He did not produce this doctor on the first trial. We commented in our opinion on this failure to produce the doctor who treated him at the date nearest the day of his discharge. On the second trial, he also failed to produce the doctor.

On the entire record, I think it must be said, the evidence was substantially the same on the second as upon the first trial on the vital and determinative issue of the case. The law of the case was therefore applicable.