**In the Matter of W. T. GRANT COMPANY, Bankrupt.**

**Bankruptcy No. 75 B 1735.**

United States Bankruptcy Court, S. D. New York.

Feb. 20, 1980.

---

## OPINION AND ORDER APPROVING OFFER OF COMPROMISE AND SETTLEMENT TO HOLDERS OF THE BANKRUPT'S CONVERTIBLE SUBORDINATED DEBENTURES

JOHN J. GALGAY, Bankruptcy Judge.

Charles G. Rodman, as Trustee of the Estate of W. T. Grant Company, Bankrupt, filed an application with the Court, dated April 18, 1979, for an order approving and authorizing the dissemination of an offer of compromise and settlement of the claims asserted against the bankrupt estate by the holders of the bankrupt's 4¾% Convertible Subordinated Debentures due 1996 and the 4% Convertible Subordinated Debentures due 1990 (hereinafter respectively referred to as the "4¾% Debentures" and the "4% Debentures" or sometimes collectively as the "Debentures" and the holders as "Subordinated Debentureholders"). By order dated April 18, 1979, the Court set a time and place for a hearing to consider the Trustee's application and directed that notice thereof be given to all parties in interest, the Securities and Exchange Commission and by publication. The hearing commenced on May 22, 1979 and continued, intermittently, on five days thereafter ending on June 19, 1979. Five (5) witnesses testified during the hearing. The transcript of the hearing consists of 987 pages and 80 exhibits were received in evidence aggregating, at least 1,500 additional pages. The Trustee and certain claimed Subordinated Debentureholders objecting to the offer of compromise and settlement and its dissemination (the "Objectants"), filed proposed findings of fact and conclusions of law and memoranda of law subsequent to the hearing aggregating in excess of 332 pages.

This proceeding and the Trustee's application in accordance with Section 27 of the Bankruptcy Act, 11 U.S.C. § 50, and Bankruptcy Rule 919(a), represent a further segment in the continuing saga of the adminis-

tration of this extraordinarily huge and complex bankruptcy case. It is the latest in a series of compromises and settlements spawned by the bankruptcy case and proposed by the Trustee. Each of the compromises, as approved, has enabled the prompt achievement of the objective of bankruptcy cases, i. e., the payment of dividends to claimants entitled thereto. *Grayson-Robinson Stores, Inc. v. Securities and Exchange Commission*, 320 F.2d 940 (2d Cir. 1963).

The major compromises and settlements are described in the decisions approving each of them. *In re W. T. Grant Company*, 3 Bankr.Ct.Dec. 54 (February 14, 1977), *aff'd* (S.D.N.Y.1977, Knapp, D. J.), *aff'd* 2d Cir. 578 F.2d 1372 (1978) (Secured Suppliers Committee); *In re W. T. Grant Company*, January 18, 1978 (4¾% Sinking Fund Debentures); and *In re W. T. Grant Company*, 4 Bankr.Ct.Dec. 597 (1978) (Bank Claimants).

Before detailing my findings and conclusions, as noted, and pursuant to the directions of the Court made at the conclusion of the hearing, the Trustee and the Objectants to the Trustee's application have each served and filed on all parties in interest their respective proposed findings of fact and conclusions of law. I am aware of the teachings of the United States Supreme Court in *U. S. v. El Paso Natural Gas Co.*, 376 U.S. 651, 656–57; 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964), in which trial courts are cautioned not to slavishly follow proposed findings of fact and conclusions of law as submitted by a party. The findings and conclusions as hereinafter set forth are based upon the Trustee's application, the evidence admitted during the hearing and the applicable principles of law. In this opinion, I have adopted findings of fact and conclusions of law submitted by the Trustee for the reason that they accurately state and reflect the true state of the record. It would be a waste of judicial time on my part merely to rephrase proposed findings and conclusions so accurately stated.

In determining to adopt such proposed findings of fact and conclusions of law as part of this opinion, I have scrutinized the Trustee's application, the proposed findings of fact and conclusions of law submitted by the parties and the memoranda of law and other papers submitted by the parties. I have also scrutinized the objections interposed by Messrs. Victor Kurtz and William Kuntz III and I have carefully reviewed the transcript of the hearing. I have found the citations to the record and the references to exhibits admitted into evidence as made on behalf of the Trustee to be accurate.

## THE BANKRUPTCY CASE

This proceeding has its genesis in the filing with the Court of a petition for an arrangement under Chapter XI, Section 322 of the Bankruptcy Act, and Bankruptcy Rule 11–6, by W. T. Grant Company ("Grant" or "Bankrupt") on October 2, 1975. By order dated April 13, 1976 Grant was adjudged a bankrupt under the Bankruptcy Act. Charles G. Rodman thereafter qualified as the Trustee of the bankrupt estate and has since acted in that capacity.

## THE CONTROVERSY

At the time of the filing of the Chapter XI petition, Grant had recorded liabilities significantly in excess of one billion dollars. A major portion of such liabilities were represented by obligations to banks and to holders of the Subordinated Debentures. During the course of the bankruptcy case claims were filed on behalf of the banks against Grant aggregating $657,369,048 (the "Bank Loans"). These claims were all incorporated in the proof of claim filed by Morgan Guaranty Trust Company of New York ("Morgan Guaranty") on behalf of itself and as agent for twenty-five (25) bank creditors of Grant (the "Bank Claimants"), Claim No. 525438. By order of this Court dated July 20, 1978 (4 Bankr.Ct.Dec. 597) and in accordance with the Bank Settlement Agreement dated as of February 24, 1978 as authorized and approved by said order, the Bank Claims were allowed in the minimum amount of $650,000,000. No appeal was filed from the order of July 20, 1978 and the Bank Settlement Agreement has been implemented in accordance with its terms.

58

The 4% Debentures were issued pursuant to an Indenture dated as of June 1, 1965 (the "1965 Indenture") between Grant and First National City Bank, as Indenture Trustee ("Citibank"). As a result of the exercise of conversion rights, as of the date of bankruptcy the aggregate outstanding principal balance of the 4% Debentures, originally in the amount of $35,000,000, had been reduced to $834,000. There are estimated to be 128 holders of the 4% Debentures.

Pursuant to the terms of the 4% Debentures and the 1965 Indenture, the 4% Debentures are subordinated in payment to certain other indebtedness of Grant. The 4% Debentures expressly provide that:

The indebtedness evidenced by the Debentures is, to the extent and in the manner provided in the Indenture, subordinate and subject in right of payment to the prior payment in full of all Senior Indebtedness (as defined in the Indenture) of the Company, whether outstanding at the date of the Indenture or thereafter incurred . . . . .

Article Three of the 1965 Indenture sets forth the covenants with respect to the subordination of the 4% Debentures. Section 3.01 of the 1965 Indenture states:

The indebtedness evidenced by the Debentures, including the principal thereof and premium, if any, and interest thereon, shall be subordinate and subject in right of payment, to the extent and in the manner hereinafter set forth, to the prior payment in full of all Senior Indebtedness of the Company, whether now outstanding or hereafter incurred, and each holder of Debentures, by his acceptance thereof, agrees to and shall be bound by the provisions of this Article Three.

The 4¾% Debentures were issued pursuant to an Indenture dated as of April 15, 1971 (the "1971 Indenture") between Grant and The Chase Manhattan Bank, N.A. ("Chase"), as Indenture Trustee. The outstanding principal balance of the 4¾% Debentures originally in the amount of $100,-000,000 had been reduced to $92,507,000 as of October 2, 1975. As of March 15, 1979, there were 2,315 registered holders of the 4¾% Debentures.

On or about August 14, 1974, Chase resigned as Indenture Trustee and was succeeded by United States Trust Company of New York, as Successor Indenture Trustee for the 4¾% Debentures ("U.S. Trust"). U.S. Trust continues to act as Successor Indenture Trustee under the 1971 Indenture.

Pursuant to the terms of the 4¾% Debentures and the 1971 Indenture, the 4¾% Debentures are subordinated in payment to certain other indebtedness of Grant. The 4¾% Debentures expressly provide that:

The indebtedness evidenced by the Debentures is, to the extent and in the manner provided in the Indenture, subordinate and subject in right of payment to the prior payment in full of the principal of and premium, if any, and interest on all Senior Indebtedness as defined in the Indenture.

Article Four of the 1971 Indenture sets forth the covenants with respect to the subordination of the 4¾% Debentures. Section 4.01 of the 1971 Indenture states:

The indebtedness evidenced by the Debentures, including the principal thereof and premium, if any, and interest thereon, shall be subordinate and subject in right of payment, to the extent and in the manner hereinafter set forth, to the prior payment in full of all Senior Indebtedness of the Company, whether now outstanding or hereafter incurred, and each holder of Debentures, by his acceptance thereof, agrees to and shall be bound by the provisions of this Article Four.

The Bank Settlement Agreement referred to above resolved an adversary proceeding that had been commenced by the Bank Claimants against the Trustee. The Bank Claimants had asserted, *inter alia*, (1) that their claims were secured under a certain Inventory Security Agreement between Grant and Fidelity Union Trust Company, as agent, dated as of May 15, 1975 (the "Inventory Security Agreement"), and a certain Security Agreement between

Grant and Morgan Guaranty, as agent, dated as of September 16, 1974 (the "Initial Security Agreement"); and (2) that the aggregate sum of $90,300,000, net of interest, included as part of the Bank Claims, represented loans and advances made to Grant as a debtor-in-possession (the "DIP Loans"), which were entitled to priority in payment as costs and expenses of administration of the aborted Chapter XI case in accordance with an order of this Court, dated October 2, 1975, authorizing and approving such loans (the "DIP Order"). In response to the Bank Claimants' assertions, the Trustee had interposed defenses asserting, *inter alia*, that (a) the Bank Claims should be subordinated to the extent deemed appropriate by the Court on the grounds that the Bank Claimants controlled and dominated the business, affairs and conduct of Grant, to the detriment of persons having interests in the business affairs and properties of the Bankrupt; (b) the claimed liens and security interests may have resulted from fraudulent conveyances or preferential transfers voidable under the Bankruptcy Act; and (c) the DIP Loans constituted no more than the release of monies to the debtor-in-possession which were improperly set off against the accounts of the debtor and as such did not give rise to any enforceable claim against assets of the bankrupt estate. The Trustee had also interposed several counterclaims against the Bank Claimants.

In consideration of the allowance of their claims in the minimum amount of $650,000,000, the Bank Claimants have released as against the bankrupt estate and the Trustee (a) the right to assert claims of liens and security interests together with interest with respect to such claims; (b) claims for interest or other charges in respect of the DIP Loans; and (c) any claim to priority status in respect of the DIP Loans. The Bank Settlement Agreement also provided that the Trustee would retain and reserve a fund in the amount of $35,000,000 for the partial satisfaction of substantially all allowed claims of general unsecured, unsubordinated creditors of the bankrupt estate ("Participating Creditors"). Based upon the financial condition of the bankrupt estate, the Trustee has estimated that under the Bank Settlement Agreement, Participating Creditors ultimately may receive distributions ranging from 42% to 50% of their allowed claims. The Trustee has estimated that the Bank Claimants ultimately may receive distributions approximating 55% or more of their allowed claims, assuming that the offer of compromise and settlement is authorized and is accepted by at least 90% of the holders of Grant's 4¾% Debentures and 4% Debentures.

A trustee in bankruptcy is charged with the duty to liquidate the assets of a bankrupt estate and distribute the proceeds thereof to the holders of allowed claims in accordance with the provisions of the Bankruptcy Act and contractual arrangements among such claimants. Accordingly, in absence of a defeasibility as to contractual arrangements, the Trustee would be bound by the subordination provisions of the 4% and 4¾% Debentures and the pertinent Indentures to pay all "Senior Indebtedness" in full before any payment could be made to holders of the Subordinated Debentures. If the Bank Claims are "Senior Indebtedness", the assets of the bankrupt estate are insufficient to pay in full such "Senior Indebtedness". Therefore, until the Bank Claims are paid in full, dividends otherwise distributable to holders of the Subordinated Debentures would be paid to the Bank Claimants in accordance with the aforesaid subordination provisions and Subordinated Debentureholders would receive no return on their claims. However, a controversy has been raised on behalf of holders of 4¾% Debentures as to whether the subordination provisions may be enforced for the benefit of the Bank Claimants. Because of the claimed controversy, the Bank Settlement Agreement provides that the Trustee is not to otherwise distribute the amount of $95,378,373 (the "Reserve Fund") which represents the full amount of the unpaid outstanding principal and accrued interest of the Subordinated Debentures to October 2, 1975, pending resolution of the controversy either by settlement or by final judgment.

The application seeks approval of and authority to make an offer of compromise and settlement to the Subordinated Debentureholders which, if effective, would allow the Trustee to pay dividends to accepting Subordinated Debentureholders and to the Bank Claimants as contemplated by the compromise and settlement.

In regard to the enforceability of the pertinent subordination provisions of the Subordinated Debentureholders and U.S. Trust have made a number of contentions. U.S. Trust has asserted that, from a period commencing in June 1973, to and including October 2, 1975, when Grant filed its Chapter XI petition, the Bank Claimants may have assumed a position of control, domination and leverage over Grant's management and financial affairs, to the detriment and prejudice of Grant and its other creditors, including the Subordinated Debentureholders. U.S. Trust has alleged that such conduct might mandate that the contractual subordination provisions be vitiated and that the Bank Claimants be equitably subordinated to the claims of the Subordinated Debentureholders. U.S. Trust has alleged that such conduct includes, but is not limited to, the following:

(a) *Initial Security Agreement:* On or about September 16, 1974, Grant's bank lenders compelled Grant to enter into the Initial Security Agreement to secure payment of Grant's unsecured obligations under the Loan and Guaranty Agreement. It is contended that when the Initial Security Agreement was entered into, the Bank Claimants knew or had reasonable cause to believe that Grant was insolvent, and that the granting of security interests would cause Grant's trade suppliers to stop or restrict credit extensions to Grant and thereby substantially reduce the amount of merchandise shipped to Grant stores with concomitant results on revenues and profits. Thereafter, trade suppliers did substantially reduce shipments of merchandise to Grant, resulting in an inadequate supply of inventory for the 1974 Christmas season. As a result of the action taken by the Bank Claimants in compelling Grant to encumber its assets, Grant was irreparably damaged, to the prejudice of Grant's other creditors including the Debentureholders. The disruption of the free flow of goods and services to Grant's stores after the security interest and/or liens were granted to the Bank Claimants impaired the prospects for a successful reorganization of Grant.

(b) *Inventory Security Agreement:* In the early months of 1975, the Bank Claimants, in order to enhance further their position in the event of a proceeding under the Bankruptcy Act, compelled Grant, by means of the Inventory Security Agreement, to give further security interests to the Bank Claimants, *i. e.,* the inventory lien. The Bank Claimants determined, however, that, to obtain such a security interest without precipitating a case under the Bankruptcy Act, it would be necessary to extend to Grant's trade suppliers an opportunity to obtain collateral security for the payment of future shipments. The Bank Claimants used their position of control and domination of Grant's management to require Grant to offer to its trade suppliers a participation in the Inventory Security Agreement. In promoting the Inventory Security Agreement and the Trade Subordination Agreement, the Bank Claimants caused Grant to contravene the terms of the 1971 Indenture, which provides that the holders of the 4¾% Debentures would be subordinated to certain defined "Senior Indebtedness"—from which definition debt owed in the ordinary course of business to trade and service creditors was excluded.

(c) *Proposed Sale of Accounts Receivable:* In 1974, the Bank Claimants directed Grant not to proceed with a proposed sale of $100,000,000 of Grant's customer accounts receivable to Beneficial Finance Corporation. A portion of the proceeds from the sale was to be used by Grant to purchase Grant's outstanding 4¾% Debentures in the open market, and to reduce Grant's outstanding loan obligations, the combined effect of which would have

had a beneficial effect upon the operating capital requirements of Grant. At the time the Bank Claimants directed Grant not to proceed with the sale of those accounts receivable, the Bank Claimants knew that in any distribution of Grant's assets in a bankruptcy case, by virtue of the subordination provisions contained in the 4¾% Debentures and the 1971 Indenture, no distribution could be made to holders of such Debentures unless and until the claims of the Bank Claimants were satisfied in full. Thus, the Bank Claimants viewed the proposed purchase of such Debentures as detrimental to their own position in the event that a bankruptcy case ensued, not only because of the potential loss of the accounts receivable as security, but also because the Bank Claimants would lose the benefit of the subordination provisions with respect to Debentures which might have been purchased by Grant in the open market.

(d) *Failure to Effect Prompt Reorganization:* The Bank Claimants used their position of control, domination and leverage over Grant's management to prevent Grant from immediately seeking proper relief to enable it to reorganize its operations and debt structure. During the approximate 12 month period commencing October 8, 1974, during which the Bank Claimants purported to perfect security. interests and liens in virtually all of Grant's assets, they continued to advance Grant barely sufficient funds to keep Grant from seeking relief under the Bankruptcy Act in. order to protect their security interests. Grant continued to operate hundreds of stores which were rendered unprofitable because the Bank Claimants refused to lend sufficient funds for working capital needed, *inter alia,* to purchase adequate merchandise inventory. During such period, Grant's operating losses exceeded two hundred million ($200,000,000) dollars. The result of the above-described conduct of the Bank Claimants was to weaken Grant internally, to damage its credit with trade suppliers, and to destroy its goodwill with customers. Viable reorganiza-tion of the operations and debt structure of Grant was thus effectively precluded, to the detriment of the Debentureholders.

In addition, certain of the Subordinated Debentureholders have filed an adversary proceeding on behalf of all 4¾% Debentureholders asserting further claims. The complaint in the adversary proceeding, entitled *Morris Lewy et al. v. Charles G. Rodman, et al.,* (the "Lewy Action"), asserts as against the Bank Claimants essentially the same averments as the Trustee's answer and counterclaim which were settled by the Bank Settlement Agreement, as well as certain claims against Chase as Predecessor Indenture Trustee for the 4¾% Subordinated Debentureholders. Common law, state and federal claims have also been asserted by or on behalf of Grant security holders, including Subordinated Debentureholders, in the following actions and proceedings: *Weinberger et al. v. Kendrick et al.,* 451 F.Supp. 79 (S.D.N.Y.1978); *Morris L. Lewy et al. v. Chase Manhattan Bank, N.A., et al.,* Index No. 17837/75, pending in the Supreme Court of the State of New York, County of New York; *Independent Investor Protective League, Inc., et al. v. Richard W. Mayer et al.,* Index No. 16927/75, pending in the Supreme Court of the State of New York, County of Westchester; and in another adversary proceeding entitled *Independent Investor Protective League, Inc. et al. v. Chase Manhattan Bank, N.A., et al.*

U.S. Trust has also submitted that the 4¾% Subordinated Debentureholders may have actionable claims against Chase in its capacity as the Predecessor Indenture Trustee for the 4¾% Subordinated Debentureholders. In substance, U.S. Trust has contended, *inter alia,* that Chase might have violated the provisions of the Trust Indenture Act of 1939 (the "Trust Indenture Act"), the terms of the 1971 Indenture and its common law fiduciary duty to the 4¾% Subordinated Debentureholders by:

(a) failing to resign as Indenture Trustee after it had acquired a conflicting interest, *i. e.,* a position of control and domination of the business and affairs of Grant, together with the other Bank Claimants;

(b) failing to notify the 4¾% Debentureholders of such conflicting interest;

(c) failing to notify the 4¾% Debentureholders of Grant's filing of allegedly misleading financial reports in 1973 and 1974 which reports failed to disclose a change in accounting treatment of delinquent customer accounts receivable and resulted in an over-statement of earnings in an amount of not less than $6,000,000;

(d) failing to take action to notify Grant that its filing of allegedly misleading reports could give rise to an Event of Default under the 1971 Indenture, thereby permitting Chase or the 4¾% Debentureholders to accelerate the maturity of the 4¾% Debentures at a time when such Debentures might have been paid in full;

(e) participating in the $700,000,000 secured Bank loans when Chase knew or had reasonable cause to believe that Grant was insolvent or insolvency was imminent; and

(f) participating, as a bank lender, in directing Grant not to proceed with the proposed sale of $100,000,000 of Grant's accounts receivable, a portion of the proceeds of which might have been used to purchase the 4¾% Debentures.

The Bank Claimants maintain that (a) they have valid secured and priority claims against the bankrupt estate as filed and (b) even if their claims were deemed ultimately to be unsecured and not entitled to priority, the subordination provisions contained in the 4% and 4¾% Indentures and Debentures remain valid and enforceable as against the Subordinated Debentureholders. They submit that irrespective of any claimed secured and priority status of the Bank Claims, the Subordinated Debentureholders may not receive any dividends from the bankrupt estate unless and until the claims of the Bank Claimants are satisfied in full.

The Bank Claimants contend as follows:

(a) The Bank Claimants did not owe any fiduciary duty to Grant or its creditors and, even if they did, such duty was in no way breached. They contend that they extended their best efforts to assist Grant in its pursuit of financial rehabilitation, and further, that they relied upon representations allegedly made by the management of Grant that its business was viable and would be profitable, and relied in addition on the financial statements of Grant audited and reported on by Grant's independent accountants. They have asserted that they would not have advanced additional moneys or extended forebearance in 1974 and 1975 if they had believed that the business of Grant was not viable.

(b) There is no precedent for vitiating contractual subordination provisions, such as those contained in the Subordinated Debentures and 4% and 4¾% Indentures, particularly where, as here, said Indentures were entered into in 1965 and 1971, prior to the alleged misconduct of the Bank Claimants. Further, they assert, even if the doctrine of equitable subordination were applicable to the present situation, the relief which might be granted would be limited to the invalidation of the liens and security interests asserted by the Bank and would not nullify the subordination provisions of the Debentures.

(c) The Bank Claimants deny that they in any way compelled Grant to enter into the Initial Security Agreement in September of 1974 or that such agreement caused Grant irreparable injury in obtaining merchandise for its business. The Bank Claimants contend that the Initial Security Agreement was freely agreed to by Grant as a prudent and normal security arrangement customary for lending institutions when major loans are extended to a borrower in Grant's position. The Bank Claimants contend that the major credit of $700,000,000 extended to Grant and partially secured by the Initial Security Agreement was essential to Grant's hopes for profitability and was sought by Grant's management.

(d) The Bank Claimants deny that they compelled Grant to enter into the Inventory Security Agreement in May of 1975 or that such agreement in any way violated the terms of 1971 Indenture or of the

4¾% Debentures. Moreover, the ability of Grant to grant security interests to its suppliers was not precluded by any negative pledge clause contained either in the 1971 Indenture or the 4¾% Debentures, and Grant was entitled to grant such security interests at any time provided only that Grant's senior debentures were equally and ratably secured.

(e) The Bank Claimants deny that they directed Grant not to proceed with a proposed sale of $100,000,000 of customer accounts receivable. The Bank Claimants contend that the proposal was rejected by Grant's management.

(f) The Bank Claimants deny that they exercised a position of control or domination over Grant or prevented Grant from seeking rehabilitation under the Bankruptcy Act. The Bank Claimants contend that they consistently acted as responsible lending institutions.

Chase has denied all of the U.S. Trust's allegations described above and has asserted the following:

(a) It never assumed control or domination of Grant, either individually or in concert with any of the other Bank Claimants;

(b) It resigned its position as Indenture Trustee in August, 1974;

(c) While serving as Indenture Trustee, it was never in a position of conflict of interest with the 4¾% Debentureholders;

(d) No event of default became known to it during the period of its indenture trusteeship which would have permitted acceleration of the Subordinated Debentures;

(e) During the time it acted as Indenture Trustee and at all relevant times after its resignation in August of 1974, it had no knowledge or reason to know of any alleged material misstatements in Grant's 1973 and 1974 financial statements and the accompanying reports of Grant's independent accountants and it relied on such statements and reports as being accurate in making substantial loans to Grant prior to October 1974 and in entering into the $700,000,000 secured loans to Grant in October of 1974; and

(f) Grant's contemplated sale in the summer of 1974 of some $100,000,000 of its accounts receivable on a discounted basis was terminated because of opposition to the sale within Grant's management as a transaction which was not in the best interests of Grant.

U.S. Trust has also asserted that the 4¾% Debentures constitute "Senior Indebtedness" as that term is defined in the 1965 Indenture. Accordingly, U.S. Trust maintains that any payments which may be made to holders of the 4% Debentures or the Indenture Trustee therefore must be paid over to the holders of the 4¾% Debentures. U.S. Trust notes that the term "Senior Indebtedness" is defined in the 1965 Indenture as "the principal of and premium, if any, and interest on. . . . (b) indebtedness of [Grant] evidenced by notes or debentures (other than the [4%] debentures) issued under the provisions of an Indenture or similar instrument between [Grant] and a bank or trust company . . . unless, in each case by the terms of the instrument by which [Grant] incurred, assumed or guaranteed such indebtedness, it is expressly provided that such indebtedness is not superior in right of payment to the [4%] Debentures." U.S. Trust maintains that the 1971 Indenture does not specifically state that the 4¾% Debentures are *not* superior in right of payment to the 4% Debentures and, therefore, that the 4¾% Debentures are superior to the 4% Debentures.

Citibank, as Indenture Trustee for the 4% Debentures, maintains that the definition of Senior Indebtedness contained in the 1971 Indenture indicates that the Debentures are *pari passu* since both are coupled as not being within the definition of Senior Indebtedness. As the relative priority of the 4¾% Debentures and the 4% Debentures is not entirely clear and, in view of the *de minimis* principal amount of the 4% Debentures presently outstanding ($834,000), the Trustee has proposed that the offer of compromise be made to holders of 4% Debentures as well as holders of 4¾% Debentures and has required, as a condition

of the offer, that the holders of the 4¾% Debentures who elect to accept the offer release any claims that they may have against the holders of the 4% Debentures and Citibank, as Indenture Trustee, for distributions made to such holders from the bankrupt estate.

## THE OFFER OF COMPROMISE AND SETTLEMENT

The full prosecution and determination of the dispute between the Trustee, U.S. Trust, the 4¾% Debentureholders and the Bank Claimants, including Chase, could be unduly protracted, resulting in great expense and a substantial delay in the administration of the bankrupt estate. As a consequence, the Trustee, the Bank Claimants and U.S. Trust explored the possibility of a compromise and settlement. The discussions that ensued extended over a period of many months. As a result of these discussions, the framework of the proposed offer of compromise and settlement evolved (the "Offer"). The terms of the Offer are set forth in full in the Trustee's application and were modified during the hearing and further by agreement of the Trustee, the Bank Claimants and the Indenture Trustees as embodied in a letter addressed to the Court dated January 23, 1980.

(a) *The Payment Terms.*

Pursuant to the Offer each holder of Subordinated Debentures may elect to receive a payment in full satisfaction of the obligations of Grant and its successors based upon such holder's Subordinated Debentures. Each Subordinated Debentureholder will be offered the opportunity to elect to receive, subject to the terms and conditions of the Offer, a net amount in cash equal to fourteen percent (14%) of the unpaid principal amount of each Subordinated Debenture properly tendered by a Subordinated Debentureholder pursuant to the Offer, as amended. The accepting Subordinated Debentureholder will have no responsibility for the fees and expenses of its Indenture Trustee. Prior to the amendment of January 23, 1980 the Offer spoke in terms of a gross amount equal to fifteen percent (15%)

but subject to deduction from that amount of the allocable fees and expenses of the particular Indenture Trustee. The implementation of those provisions would have had the effect of limiting the net recovery of an accepting Subordinated Debentureholder to a minimum of thirteen percent (13%) and a maximum of 13.85%, dependent upon the percent of accepting Subordinated Debentureholders. The modification assures accepting Subordinated Debentureholders of receiving a dividend equal to fourteen percent (14%) of the principal of properly tendered Subordinated Debentures. The payment of the fees and expenses of U.S. Trust in an amount not to exceed $975,000 and the fees and expenses of Citibank in an amount not to exceed the lesser of two percent (2%) of the unpaid principal amount of the 4% Debentures properly tendered or $16,000 will be made from the Reserve Fund to the extent not used to pay or be reserved for the claims of Subordinated Debentureholders.

Upon the Trustee's payment to an accepting Subordinated Debentureholder, such holder shall have no further rights in respect of the tendered Debentures, or under the respective Indentures, or in respect of the purchase or sale of or investment in the Debentures as against (a) the Trustee; (b) the bankrupt estate; (c) the Bank Claimants; (d) the 116 banks whose loans to Grant or W. T. Grant Financial Corporation ("Grant Financial") were paid in June of 1975; (e) in the case of the 4¾% Debentures, Chase, as Predecessor Indenture Trustee, U.S. Trust, as Successor Indenture Trustee, the holders of the 4% Debentures and Citibank, as Indenture Trustee therefor; and (f) in the case of the 4% Debentures, Citibank, as Indenture Trustee. Each Subordinated Debentureholder and each Indenture Trustee shall retain (x) all rights and remedies with respect to any claim relating to the respective Subordinated Debenture or Indentures against any persons other than those listed above and (y) all rights and remedies to obtain payment from the Trustee and the bankrupt estate of any indebtedness owed other than under the Subordinated Debentures, the re-

spective Indentures, or in respect of the purchase or sale of or investment in the said Debentures.

Upon the Trustee's payment to U.S. Trust and Citibank each of which, for purposes of administering the payments due to accepting Subordinated Debentureholders, will be appointed as a Paying Agent without compensation, U.S. Trust and Citibank shall have no obligation or duty to enforce the rights of any accepting Subordinated Debentureholder of the 4¾% Debentures or 4% Debentures, respectively. As to nontendering Subordinated Debentureholders, all rights under the Subordinated Debentures to obtain payment in full of their claims are preserved.

Neither the Offer nor the Bank Settlement Agreement or any proceedings relating to either is to constitute a determination, in any subsequent action or proceeding of any kind, concerning (a) the rights, claims and defenses of the non-accepting Subordinating Debentureholders or their representatives or of their respective Indenture Trustees; (b) the validity or enforceability of the liens, security interests or priority claims asserted by the Bank Claimants (including claims to interest and to the enforcement of any rights as third party beneficiaries under any subordination agreements except with respect to accepting Subordinated Debentureholders and the Indenture Trustees in respect thereof) or any defenses of the Bank Claimants; and (c) all such rights, defenses and claims as the non-accepting Subordinated Debentureholders or their representatives or the Bank Claimants or Chase may have. Such rights, defenses and claims are expressly preserved without prejudice in any subsequent action or proceeding concerning the rights of such non-accepting Subordinated Debentureholders.

Acceptance of the Offer by all Subordinated Debentureholders would result in the payment to such holders of an aggregate amount of about $13,206,000 net of the approximately $1,000,000 to reimburse the fees and expenses of the Indenture Trustees.

(b) *Transmittal and Acceptance of the Offer.*

The Trustee is to disseminate the Offer by distributing to the Subordinated Debentureholders a "Notice of Offer and Form of Election and Release", on which each Subordinated Debentureholder may indicate his acceptance of the Offer, and such other documents as hereinafter directed, including a conformed copy of the order approving the compromise and settlement and authorizing dissemination of the Offer and the Trustee's application, as amended in accordance with the modifications made during the hearing and thereafter. These documents, along with a letter from the respective Indenture Trustees regarding the Offer will be mailed, at the Trustee's expense, by the respective Indenture Trustees to each holder of record of the Subordinated Debentures. The Trustee will also place a notice of pendency of the Offer in The Wall Street Journal (National Edition), The New York Times and the Daily News Record on four (4) separate days in accordance with the terms of the Offer.

To tender Subordinated Debentures for payment pursuant to the Offer, a Subordinated Debentureholder must send or deliver to the Trustee the following:

(a) a properly executed Form of Election and Release; and

(b) the Debentures as to which the Offer is being accepted in proper form for transfer or, in the event any such Debentures have been stolen, lost or destroyed, a properly executed affidavit of loss and such indemnity bond or agreement as the Trustee, the respective Indenture Trustees and Chase, as Debenture Registrar, shall specify.

Other pertinent provisions of the Offer as to the Form of Election and Release, the Expiration Date of the Offer, and the Paying Agents are set forth in the Trustee's application, as amended.

(c) *Requirements for Offer to Become Effective.*

The Trustee's acceptance of all tenders of 4¾% Debentures pursuant to the Offer

shall become effective when U.S. Trust has delivered to the Trustee a certificate reflecting that 4¾% Debentures with an unpaid principal amount of not less than $83,-257,000 (equal to approximately 90% of the aggregate principal amount of the 4¾% Debentures outstanding), or, if elected by the Bank Claimants, such reduced amount as provided in the Offer, have been validly tendered. The Trustee, at any time prior to the Expiration Date, solely upon receipt of a written request of Morgan Guaranty that the unpaid principal amount of 4¾% Debentures which the Trustee may accept be reduced to an amount less than $83,275,000, shall file promptly with this Court and deliver to U.S. Trust a writing stating such reduced amount and shall publish in the national edition of The Wall Street Journal a notice to the 4¾% Subordinated Debentureholders stating the reduced amount, and upon such filing such reduction shall become effective without further notice. If the certificate delivered by U.S. Trust, as Successor Indenture Trustee, reflects that the unpaid principal amount of the 4¾% Debentures validly tendered is less than $83,257,000, or less than such reduced amount as shall have been elected by the Bank Claimants, the Trustee will return all tendered 4¾% Debentures and all forms of Election and Release to the Subordinated Debentureholders.

The Trustee's acceptance of all tenders of 4% Debentures pursuant to the Offer shall become effective when both of the following events have occurred: (a) the Trustee's acceptance of the tender of 4¾% Debentures has become effective and (b) Citibank has delivered to the Trustee a certificate reflecting that 4% Debentures with an unpaid principal amount of not less than $750,600 (equal to 90% of the aggregate principal amount of the 4% Debentures outstanding), or, if elected by the Bank Claimants, such reduced amount as provided in the Offer, have been validly tendered. The Trustee, at any time prior to the Expiration Date, solely upon receipt of a written request of Morgan Guaranty that the unpaid principal amount of 4% Debentures which

the Trustee may accept be reduced to an amount less than $750,600, shall file promptly with this Court and deliver to Citibank a writing stating such reduced amount and shall publish in the national edition of The Wall Street Journal a notice to the 4% Subordinated Debentureholders stating the reduced amount, and upon such filing such reduction shall become effective without further notice. If the certificate delivered by Citibank shows that the unpaid principal amount of the 4% Debentures validly tendered is less than $750,600, or less than such reduced amount as shall have been elected by the Bank Claimants, the Trustee will return all tendered 4% Debentures and all Forms of Election and Release to the Subordinated Debentureholders.

As to any Subordinated Debentures tendered during the first ninety (90) days after the order approving the Offer has become final, as defined, or during any extensions thereof up to and not more than a total of an additional sixty (60) days (such period of time and all such extensions referred to as the "Initial Period"), the Expiration Date of the Offer shall be deemed to be the last day of the Initial Period. If the principal amount of Subordinated Debentures required for effectiveness of the Offer is not obtained, on or before the last day of the Initial Period, the Bank Claimants shall either (a) reduce the principal amount of tendered Subordinated Debentures required for effectiveness of the Offer to the principal amount of the Subordinated Debentures tendered during the Initial Period with the result that the Offer shall then become effective as to such Subordinated Debentures, or (b) indicate, in the manner set forth in the application, that they are not reducing the requisite principal amount of such Subordinated Debentures so as to permit the Offer to become effective, in which event the Offer shall be deemed withdrawn as to any and all Subordinated Debentures and any tendered Subordinated Debentures will be returned to the persons who tendered said Debentures.

If the Offer has become effective as to the Subordinated Debentures tendered during the Initial Period, then, as to such Debentures not tendered during the Initial Period, at the option of the Bank Claimants, the Expiration Date may be extended for one or more periods not to exceed in the aggregate three (3) years from the date the order become final. In the event of such further extensions, closings, as provided in the application, shall be held every three (3) months; provided, however, that closings shall not be required unless Subordinated Debentures aggregating at least $100,000 in principal amount are tendered during such three (3) month period.

(d) *Distribution of Balance of Reserve Fund.*

Section 3.3 of the Bank Settlement Agreement provides that upon resolution of the right of Subordinated Debentureholders to receive distributions from the assets of the bankrupt estate before payment in full of the Bank Claims, the balance of the moneys retained by the Trustee pursuant to Sections 3.1 and 3.2 thereof and not distributed to Subordinated Debentureholders shall be distributed to the Bank Claimants in accordance with the Bank Settlement Agreement. Consequently, concurrently with payment (a) to the respective Paying Agents of the amounts required for accepting Subordinated Debentureholders and (b) of the amounts payable to U.S. Trust and Citibank with respect to their fees and expenses, the Trustee will pay to Morgan Guaranty, as agent for the Bank Claimants, an amount equal to the unpaid principal and interest accrued to October 2, 1975 in relation to the tendered and accepted Subordinated Debentures less (x) the amounts paid to the Paying Agents and to U.S. Trust and Citibank as to their fees and expenses, and (y) the deposits that may be made pursuant to the terms of the Offer as to disputed amounts. The balance of the moneys retained by the Trustee subject to the restriction against distribution under the Bank Settlement Agreement (which

amount shall be the amount of the unpaid principal and accrued interest to October 2, 1975 on all Subordinated Debentures not tendered and accepted) will be subject to such restruction until the resolution by settlement pursuant to court order or by final judgment of the right, if any, of such non-accepting Subordinated Debentureholders to receive any distributions from the assets of the bankrupt estate because of the subordination provisions contained in the Subordinated Debentures and the respective Indentures pertaining thereto.

*THE OBJECTIONS*

(a) *The Objectants.*

The principal objections to the Trustee's application and the Offer were filed on behalf of eleven (11) claimed holders of 4¾% and 4% Debentures.

Mr. Victor Kurtz, the principal objectant, claims to be chairman of an Ad Hoc Protective Committee of Holders of 4¾% Debentures. Mr. Kurtz claims to own $870,000 in principal amount of 4¾% Debentures. The eleven (11) objectants, inclusive of Mr. Kurtz (hereinafter collectively referred to as "Kurtz Objectants"), claim to hold a total of $2,001,000 in 4¾% Debentures, or approximately 2% of the total amount outstanding, and $75,000 in 4% Debentures, or approximately 8% of the total amount outstanding.

Mr. Kurtz began purchasing 4¾% Debentures in January, 1976, several months after Grant filed its Chapter XI petition. He and his attorney, I. Walton Bader, have been active in the case since that date. Mr. Kurtz has continually and actively engaged in the purchase and sale of 4¾% Debentures since January, 1976 and has entered into a profit sharing agreement with another individual relating to the post-bankruptcy purchase and sale of 4¾% Debentures. Mr. Kurtz testified that the average cost of his holdings approximates $60 per $1,000 of face amount of 4¾% Debentures, considerably less than the amount which he would recover if he accepted the Offer.

The evidence does not support that Mr. Kurtz or his attorneys were authorized by all of the other named objectants, which they purport to represent, to file any objections to the Trustee's application or to make the assertions set forth in the objections signed by Mr. Kurtz. The testimony given by Messrs. Kurtz and Bader at the hearing demonstrates that there were no communications with such other persons as to the specific objections made or that the Committee has ever held a meeting or functioned as a true committee.

Objections to the Offer were also filed by Mr. Kurtz as the claimed holder of $90,000 in principal amount of 4¾% Debentures. Mr. Kurtz rejects the economic terms of the Offer and contends that it is founded upon inappropriate data. He claims that the Offer is based solely on the public market price of 4¾% Debentures at various times preceding the filing of the Bankrupt's Chapter XI petition and as such it fails to consider prices paid for similar types of debentures during the same period. Mr. Kurtz did not introduce any evidence or submit any authority in support of his contentions. He has not demonstrated any basis upon which to justify denial of the Trustee's application. Accordingly, I find that his objection is not worthy of any further consideration.

Additionally, a group of institutional investors [1] (hereinafter "Institutional Holders") submitted a memorandum setting forth their position as to the Offer. In substance, the Institutional Holders do not object to the Trustee's application or urge denial of said application. Rather, they claim that the Offer contains certain inequitable features which may mandate their rejection of the Offer. Those features relat to the contemplated releases in favor of Chase and U.S. Trust as set forth above. The Institutional Holders submit that the releases are unnecessary and gratuitous.

Further, the Institutional Holders urge that the fees and expenses of U.S. Trust should be borne by all of the 4¾% Subordinated Debentureholders. The latter point has been resolved by the modification of the Offer hereinabove described. The Institutional Holders also claim that the Subordinated Debentureholders should receive interest in respect of the moneys that the Trustees agreed not to distribute under the terms of the Bank Settlement Agreement.

I find no substance in the criticism and comments submitted by the Institutional Holders. The Offer is a result of arm's length negotiations among the Trustee, the Bank Claimants, Chase and U.S. Trust. For the reasons hereinafter stated, it represents a fair and equitable solution to the controversy as to who is entitled to receive dividends from the bankrupt estate. It is consistent with the Congressional policy favoring the compromise and settlement of controversies relating to a bankrupt estate. There has been no evidence of any kind introduced in this proceeding or otherwise which would tend to indicate that either Chase or U.S. Trust committed any act in their respective capacities as Indenture Trustee and Successor Indenture Trustee for the 4¾% Debentures which would give rise to any liability to Subordinated Debentureholders. Finally, the Bank Settlement Agreement only provided a mechanism to assure that the Trustee retained sufficient funds in the bankrupt estate pending the disposition of the controversy. It did not provide for the creation of an escrow or segregated fund for the benefit of any party. The Bank Settlement Agreement does not contain any provision requiring the segregation of funds or the investment thereof for the benefit of Subordinated Debentureholders.

■■■ The Subordinated Debentureholders are general unsecured creditors of the bankrupt estate. It is a long established

1. This group consists of: State of Michigan Employees Pension Trust; State of Illinois Teachers Pension Trust; American United Life Insurance Co.; Title Insurance & Trust Co., Los Angeles; County Life Insurance Co., Bloomington, Illinois; Howe Barnes & Johnson, Inc.

principle of bankruptcy jurisprudence that interest is not payable to general unsecured creditors of an insolvent bankrupt estate. It is indisputable that Grant was insolvent at the time of the commencement of the bankruptcy case and that general unsecured creditors will not receive 100% of their claims. Therefore, the Subordinated Debentureholders are not entitled to interest on their claims. *Sexton v. Dreyfus*, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911).

(b) *The Objections As Asserted By Mr. Kurtz.*

The Kurtz Objectants essentially assert three (3) bases upon which they urge the denial of the Trustee's application, i. e., (1) the Trustee has failed to make an adequate presentation of the facts and law relating to the controversy to support the approval of the Offer and its dissemination; (2) the Bank Claims should be equitably subordinated because of the control and dominion of Grant allegedly exercised by the Bank Claimants; and (3) the Trustee, U.S. Trust and their respective counsel are subject to alleged conflicts of interest which require each of them to be disqualified.

*THE COMPROMISE AND SETTLEMENT IS IN THE BEST INTEREST OF THE BANKRUPT ESTATE AND THE DE-BENTUREHOLDERS*

■ It is clear to this Court, after a review of the record, the exhibits, memoranda, other papers and all of the proceedings had before it, that the Trustee had apprised himself of "all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the [controversy] be litigated." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). It is also evident that the Trustee formed "an educated estimate of the complexity, expense, and likely duration of such litigation, * * * and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Ibid.* at 424, 88 S.Ct. at 1163. Also, it is obvious that the Trustee compared "the terms of

the compromise with the likely rewards [or lack thereof] of litigation," *Ibid.* p. 425, 88 S.Ct. p. 1163, for the Subordinated Debentureholders. Thus, the Trustee has discharged his statutory responsibilities. *In re Blair*, 538 F.2d 849 (9th Cir. 1976).

■ The authority of a trustee to compromise and settle controversies relating to the administration of a bankrupt estate is proscribed only by the requirement that the compromise be " * * * with the approval of the court." Section 27 of the Bankruptcy Act, 11 U.S.C. § 50; Bankruptcy Rule 919(a). The Trustee has recommended that the Offer be approved and authorized as being in the best interest of the bankrupt estate and its creditors, particularly the Subordinated Debentureholders. In considering the Trustee's recommendation, this Court must weigh certain factors to determine whether the Offer is in the best interest of the bankrupt estate. These factors were aptly stated in *Drexel v. Loomis*, 35 F.2d 800 (8th Cir. 1929):

> In determining the advisability of accepting an offer of compromise, many considerations are addressed to the sound discretion of the referee . . . . Among them: (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id.* at 806. *Accord, Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

Consideration of each of the factors described in the *Drexel* case, *supra*, irresistibly leads to the conclusion that the Offer should be approved and authorized and disseminated to Subordinated Debentureholders.

(a) *"The probability of success in the litigation".*

The Trustee has directed an investigation into the acts, conduct, property and affairs

of Grant. That investigation has encompassed the Bank Claimant's relationship with Grant and the status of the Bank Claims. The investigation has been conducted primarily through the use of oral examinations under Bankruptcy Rule 205(a) and the examination, analysis and review of the books, records, papers and documents of Grant, its officers, directors and employees as well as documents, papers, records and other materials produced by the Bank Claimants and others in response to the Trustee's requests. Over 9,000 pages of stenographic transcript have resulted from such examinations. Hundreds of thousands of documents have been examined, reviewed and analyzed on behalf of the Trustee. The relationship of the Bank Claimants to Grant was carefully considered in connection with the approval of the compromise and settlement of the adversary proceeding commenced by the Bank Claimants against the Trustee over the objections of Mr. Kurtz. *In re W. T. Grant Company*, 4 Bankr.Ct.Dec. 597 (1978).

The hearing before the Court demonstrates that the Trustee carefully weighed the probabilities of a successful prosecution of contentions to invalidate the contractual subordination provisions relating to the 4% and 4¾% Debentures. It is hornbook law that consensual or contractual subordination agreements of the type contained in the 1965 and 1971 Indentures and the 4% and 4¾% Debentures are enforceable in bankruptcy. *In re Credit and Industrial Corp.*, 366 F.2d 402 (2d Cir. 1966).

The legend "SUBORDINATED" is clearly imprinted on each of the debenture certificates as part of the title of the security. The terms of the 4% and 4¾% Debentures and the respective Indentures specifically provide that the debt represented by such Debentures is subordinated and that the holder thereof agrees to the subordination of the debt to the payment of Senior Indebtedness. In a similar context, the United States Court of Appeals for the Second Circuit in *In re Credit Industrial Corp., supra*, reasoned:

Creditors who expressly agree to subordinate their claims against a debtor and the creditors for whose benefit the agreement to subordinate is executed are not similarly situated.

\* \* \* \* \* \*

[C]onsensual or contractual subordination, of which the debt subordination agreements involved here are prime examples, occurs when a creditor and the bankrupt agree to create priorities among debts. Such agreements have been uniformly enforced according to their terms by bankruptcy courts.

\* \* \* \* \* \*

*A bankruptcy court,* in order to effectuate its duty to do equity, *must enforce lawful subordination agreements according to their terms* and prevent junior creditors from receiving funds where they have "explicitly agreed not to accept them."

366 F.2d at 408–10 (Emphasis added) (citations omitted). See also *In re Associated Gas & Electric*, 149 F.2d 996 (2d Cir.), *cert. denied* 326 U.S. 736, 66 S.Ct. 45, 90 L.Ed. 439 (1945); *In re Aktiebolaget Kreuger & Toll*, 96 F.2d 768 (2d Cir. 1938); American Bar Foundation Corporate Debt Financing Project, *Commentaries on Model Debenture Indenture Provisions*, 579, 581 (1971).

Senior Indebtedness is defined in Section 1.01 of the 1971 Indenture to include "indebtedness \* \* \* of [Grant] for money borrowed from or guaranteed to persons, firms or corporations evidenced by notes or similar obligations." Review of the relevant documents indicates that it is most probable that in any litigation it would be determined that the loans made by the Bank Claimants constitute Senior Indebtedness prior to and after the execution of the Interim Loan and Guarantee Agreement.

The Kurtz Objectants contend that future borrowings are not included in the term Senior Indebtedness. It is contended that the definition of Senior Indebtedness in the 1971 Indenture when read "with due regard to \* \* \* punctuation" is ambiguous. I disagree. The record of the hear-

ing demonstrates that the term "Senior Indebtedness" as defined in the 1971 Indenture contemplates future borrowings of the type described in Article One, Section 1.01(a) of the Indenture. Standard English usage and the reading of the pertinent provisions of the 1971 Indenture and the 4¾% Debentures makes such conclusion inescapable.

In Section 1.01 of the 1971 Indenture, it is clearly stated:

> The term "Senior Indebtedness" shall mean the principal of and premium, if any, and interest on (a) indebtedness * * of [Grant] for money borrowed from or guaranteed to persons, firms or corporations evidenced by notes or similar obligations, (b) indebtedness of [Grant] evidenced by notes or debentures (other than [the 4% and 4¾% Debentures]) issued under the provisions of an indenture or similar instrument between [Grant] and a bank or trust company or (c) purchase money indebtedness of [Grant], *in each case, whether outstanding at the date of execution of this indenture or thereafter incurred*: * * *

(Emphasis added)

The clear import of Section 1.01 is that Senior Indebtedness includes indebtedness specified in clauses (a), (b) and (c) irrespective of whether outstanding at the date of the 1971 Indenture or thereafter incurred. Manifestly "in each case" relates back to and modifies each of the types of indebtedness described in clauses (a), (b) and (c) of Section 1.01.

The Kurtz Objectants urge that the use of a comma rather than a semicolon as the punctuation preceding the emphasized language requires that such language only modify and relate to the type of indebtedness described in clause (c), i. e., "purchase money indebtedness of [Grant]". However, reference to Article Four of the 1971 Indenture, which specifically states that the 4¾% Debentures are subordinate to "all Senior Indebtedness * * * whether now outstanding or hereinafter incurred * * *" undercuts the contention of the Kurtz Objectants. Article Four contains the opera-

tive provisions of the 1971 Indenture as to subordination. Furthermore, even if an inconsistency between the provisions of the Sections of Articles One and Four could be contrived, the construction to be adopted should be that which will harmonize the provisions. *National Conversion Corp. v. Cedar Building Corp.*, 23 N.Y.2d 621, 625, 298 N.Y.S.2d 499, 246 N.E.2d 351 (1969).

■ The Kurtz Objectants' reliance on the punctuation of the 1971 Indenture is misplaced. It has long been settled that punctuation alone does not control the meaning of an indenture. It is the least reliable standard for the interpretation of a writing. As stated by the United States Supreme Court:

> Punctuation is a most fallible standard by which to interpret a writing; it may be resorted to when all other means fail, but the court will first take the instrument by its four corners, in order to ascertain its true meaning; if that is apparent on judicially inspecting the whole, the punctuation will not be suffered to change it.

*Ewing's Lessee v. Burnet*, 36 U.S. (11 Pet.) 41, 54, 9 L.Ed. 624 (1837). *See also Clayman v. Goodman Properties, Inc.*, 171 U.S. App.D.C. 88, 93 n. 24, 518 F.2d 1026, 1031 n. 24 (D.C.Cir.1973); *Holmes v. Phenix Ins. Co.*, 98 F. 240, 241, 242 (8th Cir. 1899) ("The Century Dictionary tells us, what is common knowledge, that 'there is still much uncertainty and arbitrariness in punctuation.' It is always subordinate to the text, and is never allowed to control its meaning."). This rule of construction was adopted by the New York Court of Appeals in *Wirth & Hamid Fair Booking, Inc. v. Wirth*, 265 N.Y. 214, 219, 192 N.E. 297 (1934).

The Kurtz Objectants argue that the Trustee has failed to make an impartial presentation of their contention. I am satisfied that the Trustee has made an impartial presentation for the consideration of the affected parties. The Trustee's application states, at length and without comment, the pertinent provisions of the 1971 Indenture and the 4¾% Debentures with respect to the inclusion of future borrowings within the definition of Senior Indebtedness.

Moreover, at the hearing the controlling provisions of Articles One and Four of the 1971 Indenture were read into the record on behalf of the Trustee.

The Kurtz Objectants contend that the Trustee "should have called to [the Subordinated Debentureholders] attention those cases which have held that ambiguous language should be interpreted against those which were responsible for its use." The cases referred to by the Kurtz Objectants are inapposite. The definition of Senior Indebtedness as stated is not ambiguous. Further, the "terms of the debentures must therefore be * * * 'fairly construed in the light of the * * * circumstances,' no matter who was responsible for drafting them." *Zeiler v. Work Wear Corp.*, 450 F.Supp. 891, 894 (S.D.N.Y.1978), quoting, *Buchman v. American Foam Rubber Corp.*, 250 F.Supp. 60, 75 (S.D.N.Y.1965). Finally, the only testimony at the hearing in relation to the foregoing is to the effect that the Bank Claimants were not involved in the drafting of the 1971 Indenture.

It is also asserted by the Kurtz Objectants that the Bank Claims do not constitute Senior Indebtedness under the terms of the 1971 Indenture, Section 1.01, *supra*, because the Bank Claimants did not obtain direct claims against Grant until August of 1974. Prior to that time loans and advances were made to Grant Financial. In August of 1974 and in accordance with the Interim Loan and Guaranty Agreement, Grant guaranteed the payment of the indebtedness due to the lending banks from its wholly owned subsidiary, Grant Financial.

The Bank Claimants submit that by virtue of the guaranty the Bank Claims constitute Senior Indebtedness in accordance with the provisions of the 1971 Indenture. The Kurtz Objectants contend that the guaranty must be invalidated by reason of the alleged dominion and control of Grant's affairs by the Bank Claimants. This argument relates to the application of the doctrine of equitable subordination which this Court had earlier occasion to review in connection with this case in approving and authorizing the Bank Settlement Agree-ment. *In re W. T. Grant Company*, 4 Bankr.Ct.Dec. 597 (1978). I concluded that the probabilities of success in asserting such a claim were negligible. The Kurtz Objectants have not presented any new evidence or even information which would tend to compel a different conclusion. A further discussion of the doctrine of equitable subordination will be found in later portions of this Opinion.

In relation to the Bank Claims and Grant and its wholly owned subsidiary, Grant Financial, I am in agreement with the Trustee that Grant Financial would constitute a senior creditor of Grant and that the Bank Claims, as direct creditors of Grant Financial, would benefit from such senior creditor status even if the guaranty were vitiated. Grant Financial was organized for the sole purpose of making loans to Grant and borrowing funds for that purpose. This relationship is evidenced by an agreement dated as of April 29, 1970, pursuant to which Grant Financial agreed to lend to Grant for its "general business purposes, sums against the issuance and delivery to [Grant Financial] of [Grant's] promissory note, payable on demand * * *." The record establishes that Grant's indebtedness to Grant Financial was evidenced by Grant's promissory notes which were payable on demand. At the time of the filing of the Chapter XI petition the indebtedness of Grant to Grant Financial was evidenced by an Intercorporate Demand Note dated August 6, 1975 in the amount of $819,887,663. A proof of claim filed against the bankrupt on behalf of Financial asserts a claim in the amount of $819,887,663. Claim No. 525386.

As provided in Section 1.01(a) of the 1971 Indenture, the indebtedness of Grant to Grant Financial evidenced by notes constitutes Senior Indebtedness. Further, the ledger of Grant Financial reflects in detail the loans made by that entity to Grant and the amounts owing to it as reflected in notes receivable. The Bank Claimants would be the beneficiaries of the Senior Indebtedness status of the claims of Grant Financial.

Clearly, if the corporate identities of Grant and Grant Financial are to be respected it is obvious that the indebtedness of Grant to Grant Financial is entitled to the benefits of the subordination provisions of the 1971 Indenture and the 4¾% Debentures. There is no exclusion in the definition of Senior Indebtedness for intercompany indebtedness. Moreover, even if the separate corporate identities were to be disregarded on the basis that Grant Financial was an alter ego, agent or instrumentality of Grant, such a determination would not inure to the benefit of Subordinated Debentureholders.

■ A substantive consolidation of parent and subsidiary corporation results in the liabilities of the parent and subsidiary being consolidated and constituting direct liabilities of the consolidated entity. *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir. 1966). If a substantive consolidation of Grant and Grant Financial were to occur then Grant would be a direct obligor to the Bank Claimants for all moneys borrowed by its consolidated subsidiary, Grant Financial. Inasmuch as such borrowings are represented by notes, there would be no question that borrowings would constitute Senior Indebtedness. *In re Gulfco Investment Corp.*, 593 F.2d 927, 19 Collier's Bankr.Cas. 758 (10th Cir. 1979); *Rhedom Realty Corp. v. Mammoth Mart, Inc.*, 397 F.Supp. 381 (D.Mass.1975).

In an attempt to buttress their position, the Kurtz Objectants argue that Grant's indebtedness to Grant Financial was not intended to constitute Senior Indebtedness. In support of that argument, reference is made to the prospectus issued by Grant dated April 7, 1971 in relation to the 4¾% Debentures. The failure of the prospectus to include intercorporate debt as part of then existing Senior Indebtedness is not controlling on this issue. The then outstanding indebtedness by Grant to Grant Financial in the amount of $246,420,216 is includable in the definition of Senior Indebtedness as set forth in the 1971 Indenture. Curiously, the Kurtz Objectants urge that the description of Senior Indebtedness in the prospectus is controlling as to intercorporate indebtedness but not as to the inclusion of future borrowings as Senior Indebtedness.

■ The argument of the Kurtz Objectants is not persuasive. The definition of Senior Indebtedness as contained in the 1971 Indenture was incorporated by reference into the prospectus by the terms thereof. In those cases in which a conflict exists between an indenture and a prospectus, the indenture controls. In *In re Discon Corp.*, 346 F.Supp. 839, 844 (S.D.Fla.1971), when confronted by a similar conflict, the Court stated:

> It is the indenture which spells out the debenture agreement; the prospectus in this case, merely summarized it. . . . By inadvertence or oversight certain rights of non-superior creditors were stated in the prospectus to exist which do not exist. The prospectus, however, cannot create these rights, for that is not its purpose. . . . [A]ny conflict must be resolved by reference to the indenture, incorporated by reference into the prospectus by the prospectus' own terms.

Accordingly, it is clear that Grant's indebtedness to Grant Financial would constitute Senior Indebtedness that would have to be satisfied in full from the bankrupt estate before any dividends could be paid to Subordinated Debentureholders. As stated, this would inure to the benefit of Bank Claimants. As a consequence, although the guarantee by Grant of Grant Financial's indebtedness in August 1974 may have represented the first direct obligation from Grant to the Bank Claimants, it did not materially improve the position of the Bank Claimants, *vis-a-vis* the Subordinated Debentureholders.

Finally, as in prior proceedings in this bankruptcy case, the Kurtz Objectants contend that during the two year period prior to the filing of the Chapter XI petition by Grant, the Bank Claimants controlled and dominated the bankrupt's affairs to the detriment of Grant and its creditors. It is asserted that proof of such conduct would result in the equitable subordination of

Bank Claims to the claims of the Subordinated Debentureholders. The Kurtz Objectants submit that the Trustee has erred by electing not to pursue this avenue. I am satisfied that the doctrine of equitable subordination offers little prospect of success and that the Trustee has acted on the basis of an informed judgment and in the best interests of the Subordinated Debentureholders in recommending the approval of the Offer.

The Trustee has recommended the Offer in light of the established principle that contractual subordination provisions do not offend the policy of equality of distribution of the assets of a bankrupt estate and will be enforced in accordance with their terms by bankruptcy courts. *In re Credit Industrial Corp.*, 366 F.2d 402 (2d Cir. 1966).[2] The record amply establishes that the Trustee weighed the probabilities of success as to the contentions of the Subordinated Debentureholders that the Bank Claims be equitably subordinated to the claims of all other creditors, including Debentureholders as well as the prospects of potential recoveries on behalf of the bankrupt estate insofar as they may relate to the claims of Subordinated Debentureholders. I agree with the Trustee.

▮ A fundamental characteristic of the bankruptcy court is its expansive equitable powers. The doctrine of equitable subordination is a manifestation of such powers and provides a means of regulating distributions from a bankrupt estate by adjusting the hierarchy of creditors' claims to the equitable levels of the creditors' comparative claim positions. Its purpose is "to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *In re Kansas City Journal-Post Co.*, 144 F.2d 791, 800 (8th Cir. 1944). The relief resulting from the application of said doctrine is remedial in nature and is generally limited to eradicating the results of overreaching or fraudulent conduct. *In re Mobile Steel Company*, 563 F.2d 692 (5th Cir. 1977).

▮ Equitable subordination is an extraordinary remedy. In its application, the claim of one creditor may be subordinated to that of another creditor only to the extent necessary to offset injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective. *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). The power of equitable subordination may not be exercised in the absence of an injury to the other claimants. *Comstock v. Group of Institutional Investors*, 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911 (1948); *In re Mobile Steel Company*, 563 F.2d 692, 700 (5th Cir. 1977); *In re Branding Iron Steak House*, 536 F.2d 299, 302 (9th Cir. 1976). The remedy of equitable subordination has been applied only sparingly and is not to be used unless the claimant sought to be subordinated (a) has acted in a fiduciary capacity; (b) has breached a fiduciary duty; (c) that breach resulted in detriment to those claimants to whom a duty was owed, *Comstock v. Group of Institutional Investors, supra; Farmers Bank of Clinton v. Julian*, 383 F.2d 314 (8th Cir.) *cert. denied*, 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967); *Rader v. Boyd*, 252 F.2d 585 (10th Cir. 1957); *Dabney v. Chase Nat. Bank*, 196 F.2d 668 (2d Cir. 1952), *as supplemented*, 201 F.2d 635 (2d Cir.), *cert. dismissed per stipulation*, 346 U.S. 863, 74 S.Ct. 102, 98 L.Ed. 374 (1953); or (d) committed an act of moral turpitude, causing damages to other creditors, *In re Bowman Hardware & Electric Co.*, 67 F.2d 792 (7th Cir. 1933).

▮ The standards governing the application of the doctrine of equitable subordination are not precisely defined and each case is dependent upon its peculiar facts. It is established, however, that in applying such doctrine the burden of proof will differ according to the relationship of the creditor and the debtor. With respect to a non-insider creditor's conduct, the standard of

---

2. This principle has been codified in Section 510(a) of the Bankruptcy Code, 11 U.S.C. § 510(a), 92 Stat. 2549, 2586.

misconduct that would have to be demonstrated to justify equitable subordination is very substantial. As stated by the United States Court of Appeals for the Seventh Circuit in *In re Bowman Hardware & Electric Co.*, 67 F.2d 792, 794 (1933):

> Before a general creditor's claim against the bankrupt may be disallowed or its status lowered, it must appear that said creditor has been guilty of some act involving moral turpitude or some breach of duty or some misrepresentation whereby other creditors were deceived *to their damage*. In the instant case the absence of any evidence showing that other creditors were damaged by appellant's action, conceding for the moment that such action amounted to fraud, is fatal to the asserted priority of all other general creditors save Van Camp Hardware and Iron Company. [citing cases]

A creditor is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim. *Farmers Bank of Clinton v. Julian, supra; Rader v. Boyd, supra; Crowder v. Allen-West Commission Co.*, 213 F. 177 (8th Cir. 1914). As stated in *Rader*:

> A confidential relationship is never presumed and the burden is upon the party asserting it * * * Parties may assuredly deal at arm's length for their mutual benefit without raising a confidential relationship between them * * It may be that his conduct did not conform to the highest ethical standards, but having no fiducial relationship, his duty arose no higher than the morals of the market place. 252 F.2d at 587

Even in the situation where a creditor exercises a significant degree of daily monitoring of its debtor, the application of equitable subordination has been denied. *Crowder v. Allen-West Commercial Co.*, 213 F. 177 (8th Cir. 1914); *Ingram v. Lehr*, 41 F.2d 169 (9th Cir. 1930).

In *Farmers Bank of Clinton v. Julian, supra*, the court refused to apply equitable

subordination to the claims of a bank, stating that "subordination * * * is usually exercised against corporate insiders to take advantage of their position and knowledge to defraud creditors," and further:

> In the case at bar * * * the Bank * * * had no interests in the bankrupt's operation, except as a creditor supplying the normal banking services of accounts and loans to the bankrupt. There is absolutely no evidence of any fraud or unfair dealing. The Bank went to lengths to aid and assist the bankrupt in his operations and should not be penalized for trying to help the bankrupt keep intact his business. No other creditors were misled or suffered any damage by reason of the Bank extending credit. 383 F.2d at 322, 323.

The difficulty of sustaining a claim of equitable subordination even against an insider-creditor who has a fiduciary responsibility to act in the best interests of the bankrupt is demonstrated by a recent decision of the United States Court of Appeals for the Tenth Circuit. *In re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389 (1979). In that case, the Court of Appeals refused to subordinate loans by a dominant shareholder to a failing corporation. The court held that the mere transaction of a secured loan transaction between the insider and the bankrupt *per se* did not warrant the subordination of the insider's claim. Rather, the Court of Appeals determined that there would have to be a showing of "fraud or sharp dealing" before any equitable subordination of the controlling shareholder's claim.[3]

In order to equitably subordinate the claims of non-insiders, a greater burden must be sustained. It must be established that the holder of the claim to be subordinated committed fraud, overreaching or spoliation to the detriment of others. A mere statement that the creditor is guilty of "inequitable conduct" will not suffice. *In re Prima*, 98 F.2d 952 (7th Cir. 1938); *In*

---

3. See also *In re Virginia Dinner Theater, Inc., a/k/a Cavalier Dinner Theater*, CCH Bankr.L. Rep. ¶ 67,232 (E.D.Va. B 78–356–N, July 24, 1979) reversing the bankruptcy court's subordination of the claim of insider creditor.

*re Process-Manz Press, Inc.*, 236 F.Supp. 333 (N.D.Ill.1964), *Rev'd* on jurisdictional grounds, 369 F.2d 513 (7th Cir. 1966), *cert. denied sub nom.*, *Limperis v. A. J. Armstrong Co., Inc.*, 386 U.S. 957, 87 S.Ct. 1022, 18 L.Ed.2d 104.

██ The *Prima* case is particularly instructive. In that case, a trustee sought to recover payments made to two secured bank lenders. It was alleged that the banks had mismanaged the bankrupt through the agency of one Skinner, the General Manager, who was allegedly hired as a result of bank threats to call their loans. The trustee in that case claimed that the activities of the banks amounted to overreaching to the detriment of the bankrupt and its other creditors. The Court of Appeals rejected the contention that Skinner was the agent of the banks and determined that the activities of the banks had been limited to recommending that a manager be appointed to deal with the bankrupt's problems. Significantly, in that case it was determined that no fiduciary relationship existed between the bankrupt and its bank creditors and, therefore, a threat to call or demand payment of outstanding loans did not constitute overreaching but rather the exercise of a legal right. As the court stated:

> Aside from the provisions of the bankruptcy law, a creditor has a right to call a loan when due and to lawfully enforce collection. *He may refuse an extension for any cause which may seem proper to him, or even without any cause. The law provides certain means for the enforcement of claims by creditors. The exercise of those rights is not inherently wrongful.*
>
> \*  \*  \*  \*  \*  \*
>
> No doubt the debtor, because of its inability to meet its maturing obligations, acquiesced in [the bank's] recommendations,

but this we think is not sufficient to constitute domination of its will.

98 F.2d at 965. (Emphasis added).

As to the degree of control necessary to provide a basis for the equitable subordination of a non-insider's claim, the *Process-Manz* case, *supra*, is pertinent. In that case, a non-insider creditor so dominated and controlled the bankrupt that the court treated it as the equitable owner of the bankrupt, subject to fiduciary responsibilities, rather than that of an arm's-length creditor. The evidence in that case established that the creditor had fraudulently obtained over 90% of the debtor's stock and controlled 100% of its income. The subordination of the claims was predicated upon the unfair, inequitable and fraudulent conduct of the creditor to the detriment of the bankrupt. In the case at bar, there is no evidence that the conduct of the Bank Claimants even remotely approaches the extent of the misconduct of the creditor in *Process-Manz*.

I am satisfied that in the case of Grant the transactions between the Bank Claimants and Grant are the result of arm's-length negotiations conducted in good faith and governed by the dictates of sound business judgment. I have reviewed the evidence and, in particular, the portions of testimony elicited in examinations pursuant to Bankruptcy Rule 205(a) which the Kurtz Objectants claim establish control and domination on the part of the Bank Claimants. The excerpts referred to by the Kurtz Objectants constitute but a small portion of the vast amount of information, facts and materials considered by the Trustee. To a considerable extent, the "facts" presented by the Kurtz Objectants are based upon hearsay testimony, distortions of testimony, out-of-context statements or misstatements.[4]

---

4. For example, the Kurtz Objectants assert as a "fact" which the "Trustee fails to disclose" that the proposed sale of a portion of Grant's customer accounts receivable did not go through in July of 1974 "because DeWitt Peterkin, Vice Chairman of Morgan Guaranty, who was also a director, Chairman of the Audit Committee and a member of the Executive Committee of Grant, advised the Board of Directors that the banks were opposed to the sale." (Kurtz Proposed Findings of Fact Para. 49(j)). The testimony cited by the Kurtz defendants in support of this statement reflects that it was Mr. Pierson who advised the board that two of the major bank lenders opposed the sale. (Kelly Examination 78–80). This testimony is insuffi-

The record establishes the converse. It appears that the actions taken by Grant reflected independent policy decisions and not rigid submission to the dictates of the Bank Claimants. Mr. Sundman, a chief financial officer of Grant who had been appointed a director in 1974, testified that he operated without instructions from the Bank Claimants and that the advisory group organized by the Bank Claimants in 1974 offered neither suggestions nor opinions as to the business operations of Grant. There has been no evidence introduced by the Kurtz Objectants which would tend to establish that the Bank Claimants prevented Grant from initiating a proceeding under the Bankruptcy Act in 1974 or 1975. The record demonstrates that prior to the decision made by the Grant Board of Directors during the end of September 1975 to seek relief under the Bankruptcy Act, both the Bank Claimants and Grant management viewed Grant as a turnaround situation and not insolvent.

Accordingly, it must be concluded that the probabilities of success as to the prosecution of claims of equitable subordination are very remote. In that context, the Trustee's recommendation is well founded. Although afforded every opportunity in this proceeding and others in this case, neither Mr. Kurtz nor his representative has produced a scintilla of evidence which would demonstrate a probability of success in rela-

tion to the subordination of the Bank Claims.

■ Finally, in connection with this subject, I acknowledge that post-bankruptcy purchasers of debt securities of an entity in bankruptcy obtain allowable claims equal to the face amount of such securities, provided that such purchasers owe no fiduciary obligations to the debtor, other creditors or shareholders of the debtor, and have not acquired the debt securities through fraud, misrepresentation or any other form of overreaching. *In re Lorraine Castle Apartments Bldg. Corporation*, 149 F.2d 55 (7th Cir.), *cert. denied*, 326 U.S. 728, 66 S.Ct. 35, 90 L.Ed. 432 (1945); *In re Franklin Bldg. Co.*, 178 F.2d 805 (7th Cir. 1949), *cert. denied*, 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1383 (1950); *Moulded Products, Inc. v. Barry*, 474 F.2d 220 (8th Cir.), *cert. denied*, 412 U.S. 940, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973); *In re V–I–D, Inc.*, 101 F.Supp. 71 (N.D.Ind.1951); *aff'd*, 198 F.2d 392 (7th Cir. 1952), *cert. denied*, 344 U.S. 914, 73 S.Ct. 337, 97 L.Ed. 705 (1953); *In re Automatic Equipment Mfg. Co.*, 106 F.Supp. 699 (D.Neb.1952), *app. dismd.*, 202 F.2d 955 (8th Cir. 1953); *In re Celotex Co.*, 12 F.Supp. 1 (D.Del.1935); *In re Indiana Central Telephone Co.*, 24 F.Supp. 342 (D.Del.1938); *In re Philadelphia & Western Ry. Co.*, 64 F.Supp. 738 (E.D.Pa.1946); 8B C.J.S. Bankruptcy § 936.

cient to support Kurtz's conclusion that the Bank Claimants prevented the proposed sale from going forward. In fact, neither Messrs. Pierson nor Luckett could recall Mr. Peterkin ever having any involvement in the proposed transaction.

The Kurtz Objectants further imply that Mr. Peterkin participated in discussions as to the "$600,000,000 bank loan." (Kurtz Proposed Findings of Fact Para. 49(p)). In fact, the testimony cited by Kurtz relates to the initial discussion of the $100,000,000 term loan in mid-1973. Whereas Kurtz suggests that Mr. Peterkin participated in loan negotiations with the banks, the very testimony cited (and the testimony contained in the immediately preceding transcript pages) is to the contrary. Mr. Curtin testified that Mr. Peterkin was a "dedicated outside director" who was very much aware of "his relationship with the bank" and took no part on the banking side of Grant other than getting the right people together. (Curtin Ex-

amination 1004, 1006). He further testified that Mr. Peterkin did not get involved in the discussions with the banks of matters relating to financing the company and concluded that Mr. Peterkin "would never impinge or be put in the position where he was acting with two hats." (Curtin Examination 1009, 1012, 1014).

A further example of the disregard for the record is the description of what he purports to be testimony by Mr. Kelly that the "banks were running the company." (Kurtz Proposed Findings of Fact Para. 49(aa) and (bb)). This testimony in fact shows that Mr. Kelly did not recall saying that the banks were running Grant, that he denied that they were running the company, and that he had not said and would not say that people said the banks were running the company because the distinction between the banks' role and running the company was a grave one. (Kelly Examination 82–85).

However a question remains as to the standing of purchasers of debt securities to assert extrinsic claims over and beyond the debt securities. The availability of equitable subordination might be found to belong only to the transferors and constitute an extrinsic claim or entirely different issue than the collection of the face amount of the debt security as a contractual obligation. This is particularly pertinent in the case at bar inasmuch as it has been established that Mr. Kurtz acquired his 4¾% Debentures months after the commencement of Grant's Chapter XI case and that he continued to purchase 4¾% Debentures after Grant was adjudged a bankrupt on April 13, 1976 and the Trustee had filed his answer and counterclaims in the adversary proceeding commenced by the Bank Claimants. This is probably true with one or more of the Kurtz Objectants as well as other Subordinated Debentureholders. As stated above, the equitable power to subordinate claims of one creditor to those of another may not be exercised in the absence of injury to the other creditor. It is difficult to perceive injury on the part of Subordinated Debentureholders who purchased their Debentures after the alleged misconduct of the Bank Claimants, the intervention of bankruptcy and at distressed prices.

■ It, therefore, appears that the doctrine of equitable subordination may not be asserted by persons such as Mr. Kurtz who purchased their claims against the bankrupt after the alleged misconduct of the Bank Claimants. Conceivably, State law may control what rights pass with the transfer of debentures. For example, under the General Obligations Law of the State of New York, Section 13–107(1), unless expressly reserved in writing, a transfer of any bond vests in the transferee all claims or demands of the transferor, whether or not such claims or demands are known to exist (a) for damages or rescission against the obligor [Grant] on such instrument, (b) for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding, and (c) for damages against any guarantor of the obligations of such obligor, trustee or deposi-

tary. Section 13–107(1) does not provide for a transfer of claims of the transferor against anyone other than the persons in the three specifically identifiable categories. The Bank Claimants are not within the ambit of the three categories of a transferor's claims which would pass to a transferee by operation of law. *Cf. In re Four Seasons Nursing Centers of America, Inc.*, 472 F.2d 747 (10th Cir. 1973); *Bateson v. Magna Oil Corp.*, 414 F.2d 128 (5th Cir. 1969), *cert. denied*, 397 U.S. 911, 90 S.Ct. 909, 25 L.Ed.2d 91 (1970); *Blum v. Morgan Guaranty Trust Co. of New York*, 539 F.2d 1388 (5th Cir. 1976).

The record overwhelmingly supports the Trustee's evaluation as to the probable success of the prosecution of the claims of equitable subordination. The probability of success is minimal. Additionally, the cost of such dubious pursuit would be substantial and inimical to the administration of the bankrupt estate. There is no basis for incurring the cost of such a highly speculative venture particularly in light of the alternative of the approval of the Offer.

■ The Kurtz Objectants also argue that the terms of the Offer in respect of the release of Chase requires the disapproval of the Trustee's application. I find no support for the allegations of the Kurtz Objectants that Chase as Predecessor Indenture Trustee breached its fiduciary responsibilities to the 4¾% Subordinated Debentureholders. The record reflects that the Trustee reviewed the files of Chase in respect of its activities as Indenture Trustee and I have carefully scrutinized the testimony of the Chase officer who was deposed by counsel for the Kurtz Objectants. That testimony establishes that Chase resigned to avoid any perception of conflict with the Subordinated Debentures. Subsequent to its resignation, Chase increased its loans and advances in connection with the bankrupt in apparent belief that Grant's financial problems were temporary and that it would effect a total recovery. As stated in *Morris v. Cantor*, 390 F.Supp. 817 (S.D.N.Y.1975) " * * * the mere existence or creation of

a dual relationship, as trustee under [an] indenture and as preferred creditor of the obligor on the bonds" is not a *per se* breach of fiduciary responsibility to debentureholders under the Trust Indenture Act of 1939. *Ibid.* at 823.

Liability to debentureholders only will result from "willful misconduct", a very high standard constituting "knowing, intentional action in flagrant disregard of the interests of the bondholders." *Ibid.* at 824. Such conduct or action was not found in *Morris v. Cantor, supra*, and no information or evidence has been presented in this case to indicate probable establishment of such conduct or action on the part of Chase. It would be improvident for me to deny the Trustee's application on the basis of unsupported charges of the Kurtz Objectants.

(b) *"Difficulties, if any," with respect to "Collection".*

There will be no difficulty in collecting a judgment or obtaining appropriate relief in connection with the successful litigation of claims. The record demonstrates that pursuant to a stipulation dated May 10, 1978 among the Trustee, Morgan Guaranty and U.S. Trust, the rights of Subordinated Debentureholders and the Bank Claimants have been preserved and funds are available to satisfy any potential judgment or determination of the respective rights. However, the Trustee has demonstrated that any litigation will require a substantial amount of time and offers little hope for success. Consequently the full litigation of such remote claims would necessarily impair the ability of the Trustee to discharge his duties under Section 47 of the Bankruptcy Act, 11 U.S.C. § 75, as to the collection, liquidation and closing of the administration of the bankrupt estate "as expeditiously as is compatible with the best interests of the parties * * *."

(c) *The "complexity" and "expense" of the litigation.*

The complexities of prosecuting the claims of equitable subordination against the Bank Claimants are obvious. The litigation presents sharply disputed issues of fact and law and imprecise standards to be applied. All litigation is time consuming and expensive and the proposed litigation would be even more so.

(d) *"The paramount interest of creditors".*

The record demonstrates that if the Offer is rejected and the Subordinated Debentureholders are unsuccessful in any attempt to vitiate the subordination provisions they will not participate in any recovery from the assets of the bankrupt estate. The Kurtz Objectants consist of approximately 2% of the outstanding principal amount of the 4¾% Debentures and one (1) holder or approximately 8% of the outstanding principal amount of the 4% Debentures. The respective Indenture Trustees support the approval of the Offer and its dissemination. The attempts on the part of Mr. Kurtz to incite large scale opposition to the Offer have been unsuccessful. I find that the paramount interest of the creditors justifies approval of the Offer.

Although I do not read *TMT Trailer Ferry, supra*, as requiring me to conduct the equivalent of a trial on the merits before being in a position to determine whether the approval of an offer of compromise and settlement is warranted, I find that the Trustee has conformed with the requirements of that case as well as those stated in *In re Blair, supra*. See also, *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567 (5th Cir. 1960); *In re Riggi Bros.*, 42 F.2d 174 (2d Cir.) *cert. denied sub nom., Wood & Selick, Inc. v. Todd*, 282 U.S. 881, 51 S.Ct.85, 75 L.Ed. 777 (1930); *Newman v. Stein*, 464 F.2d 689 (2d Cir.) *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *Saylor v. Lindsley*, 456 F.2d 896 (2d Cir. 1972); *Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *In re Tubotron*, 3 Bankr.Ct.Dec. 525 (S.D.N.Y. 1977).

The record is more than adequate to enable me to make an informed and reasoned judgment in relation to the Trustee's application. None of the objectants has estab-

lished any meaningful basis upon which to preclude the consideration of the Offer by Subordinated Debentureholders. As previously determined by this Court, objectants cannot stand in the way of a compromise and settlement by simply objecting thereto and resting. This principle was enunciated by the United States Court of Appeals for this circuit in *Detroit v. Grinnell Corp.,* 495 F.2d 448 (1974):

> [The objectants] have not even attempted to make such a showing. Their sole complaint is that [the proponents of the settlement] have not proven that each of the claimants had actual or constructive knowledge of the fraudulent concealment. However, the burden of proof is upon [objectants] and not upon [the proponents]. Needless to say, they have neither carried nor attempted to carry this burden. . . . They exclaim with some indignation that "there is not an iota of evidence and none is cited by defendants to support their bold assertion that the 'concealment ended' in 1953. . . . " Since *no [objectant] has ever tendered any proof to the effect that fraudulent concealment persisted after 1953, that issue must be considered as settled in favor of [the proponents].*

*Id.* at 461 (Emphasis added).

In the same opinion, the Court of Appeals also stated:

> [The objectant] claims that since the proponents of the settlement have the burden of justifying it to the satisfaction of the trial court, it remains [the proponents'] duty to produce documents and other evidence to substantiate the offer. [The objectant] apparently feels that he may sit back and request the production of documents that have already been produced [during discovery] . . . . .

In general, the position taken by the objectors is that by merely objecting, they are entitled to stop the settlement in its tracks, without demonstrating any factual basis for their objections, and to force the parties to expend large amounts of time, money and effort to answer their rhetorical questions, notwithstanding the copious discovery available from years of prior litigation and extensive pre-trial proceedings. *To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process. On their theory no class action would ever be settled, so long as there was at least a single lawyer around who would like to replace counsel for the class and start the case anew. To permit the objectors to manipulate the distribution of the burden of proof to achieve such an end would be to permit too much. Although the parties reaching the settlement have the obligation to support their conclusion to the satisfaction of the District Court, once they have done so, they are not under any recurring obligation to take up their burden again and again ad infinitum unless the objectors have made a clear and specific showing that vital material was ignored by the District Court.*

*Id.* at 464 (Emphasis added). See also, *Feder v. Harrington,* 58 F.R.D. 171 (S.D.N.Y. 1972).

The record is devoid of any showing that the Trustee has erred in his evaluation of the facts or the law as it applies to the controversy. The contentions of the Kurtz Objectants are insufficient and grossly inadequate to block the dissemination of the Offer and the affording of an opportunity to Subordinated Debentureholders to realize some return upon their claims.

### THE CLAIMED DISQUALIFICATION OF THE TRUSTEE, U.S. TRUST, AND THEIR ATTORNEYS

Despite the Kurtz Objectants' failure to demonstrate error or any defect in the Trustee's evaluation, in an effort to deprive Subordinated Debentureholders of the opportunity to accept or reject the Offer, the Kurtz Objectants attack the qualifications of the Trustee, his attorneys, U.S. Trust and its attorneys. The record reflects the evolution of events which have resulted in the attacks made by the Kurtz Objectants and, particularly, Mr. Kurtz. It is self-evident that the precipitating cause for

the attacks is the refusal by the Trustee, his attorneys, U.S. Trust and its attorneys to blindly follow the advice and instructions of Mr. Kurtz. At such times as the Trustee and his attorneys were pursuing areas of activity which coincided with Mr. Kurtz' desires there were no claims of disqualification or conflicts of interest. Indeed, Mr. Kurtz was quite complimentary of the Trustee and his attorney at those times. However, rejection of Mr. Kurtz' advice has led to the instant claims of disqualification and conflicts of interest, the filing of a grievance complaint against the Trustee's attorney and the threat to file a similar grievance complaint against the attorneys for U.S. Trust. Unfortunately motions to disqualify adversaries and add them as parties to an action are " * * * simply a tactical maneuver designed in bad faith * * * " and often " * * * represent the culmination of a pattern of highly improper conduct [based upon] making baseless and unjustified personal and professional attacks upon numerous reputable persons involved in the case, including counsel for various parties and district judges." *Lowenschuss et al. v. Bludhorn et al.*, 613 F.2d 18, 20 (2d Cir. 1980). I find no merit or substance in the allegations made by the Kurtz Objectants.

(a) *The Trustee.*

Prior to his appointment and qualification as the Trustee of this bankrupt estate, Charles G. Rodman was the Chairman of the Board of Directors and Chief Executive Officer of the Grand Union Company. Mr. Rodman had been employed by the Grand Union Company for 24 years. The Kurtz Objectants charge that Mr. Rodman is disqualified from further participation in this proceeding because his name was submitted as a candidate for standby trustee in the Chapter XI case by a representative of Chase. Mr. Rodman's name as a candidate for standby trustee was one of several submitted for the consideration by the Statutory Creditors' Committee in the Chapter XI case. He was elected by creditors as the standby trustee in the Chapter XI case under Bankruptcy Rule 11–27.

The Kurtz Objectants argue that because Mr. Rodman was nominated for consideration by Chase, a Bank Claimant, and that the Grand Union Company had once borrowed funds from Chase, he must be disqualified from acting as trustee in this case. The argument is without merit.

On April 13, 1976 when Grant was adjudged bankrupt, Mr. Rodman qualified as the trustee in bankruptcy. At the time of his qualification he was interrogated by me as to his qualifications and the circumstances pursuant to which he was nominated and elected as a standby trustee. He detailed his contacts with Chase. The testimony which Mr. Rodman gave on April 13, 1976 satisfied me that he would independently and objectively discharge and perform the duties of a trustee under the Bankruptcy Act.

Section 44 a of the Bankruptcy Act, 11 U.S.C. § 72 a and Bankruptcy Rule 209(a) confer upon the creditors of a bankrupt estate the right to elect a trustee in bankruptcy. In the case at bar the election of Mr. Rodman as Trustee conformed in all respects with the provisions of the Bankruptcy Act and Rules of Bankruptcy Procedure. It is axiomatic that the mere fact that an individual or entity is nominated and elected as a trustee or standby trustee by a creditor of the bankrupt does not result in the creation of a conflict of interest or a basis for disqualification of the elected Trustee. *In re Mayflower Hat Co.*, 65 F.2d 330 (2d Cir. 1933); *In re Eloise Curtis, Inc.*, 326 F.2d 698 (2d Cir. 1964). As the Court of Appeals for this Circuit stated in *In re Freeport Italian Bakery, Inc.*, 340 F.2d 50, 54 (2d Cir. 1965):

> Potential conflicts of interest do not of themselves disqualify creditors from being appointed trustees in bankruptcy, even when they have already acted as a receiver, assignee for the benefit of creditors, or reorganization trustee, i. e., in capacities in which they must account to the bankruptcy court for their stewardship of the bankrupt's estate. *In the Matter of G. E. C. Securities, Inc.*, 331

F.2d 655 (2d Cir. 1964); *In the Matter of Eloise Curtis, Inc.,* 326 F.2d 698 (2d Cir. 1964). See also *Schwartz v. Mills,* 192 F.2d 727, 29 A.L.R.2d 1161 (2d Cir. 1951). "The fact that * * * is a nephew-in-law and cousin of the two presidents of the bankrupt corporation does not of itself disqualify * * * from voting for or being appointed as trustee. Grounds for disapproval or removal of a trustee in bankruptcy are not to be found in his formal relationships. "[W]e have traditionally stressed the elements of fraud and actual injury to the debtor interests * * *." *Schwartz v. Mills, supra,* 192 F.2d at 729.

I am satisfied that Mr. Rodman has demonstrated no bias against any group of creditors during his stewardship of the bankrupt estate over the past three and three-quarters years.

The record establishes that he has conducted a thorough examination of the relationship of the Bank Claimants with Grant. He successfully negotiated the Bank Settlement Agreement which significantly reduced the dividends that the Bank Claimants might otherwise have received and which resulted in material benefits to other creditors. The request of the Kurtz Objectants that the Trustee be disqualified is denied.

(b) *The Trustee's Attorneys.*

The attack made by the Kurtz Objectants as to Weil, Gotshal & Manges, attorneys for the Trustee ("WGM"), merits a similar fate. It is a cardinal principle of bankruptcy administration that a trustee in bankruptcy is entitled to engage attorneys of his choice, subject only to the approval of the court. *In re Magna Products Corp.,* 251 F.2d 423, 424 (2d Cir. 1957); *In re Columbia Iron Works,* 142 F. 234 (E.D.Mich.1904). Disqualification of a trustee's attorneys requires considerable reluctance inasmuch as disqualification has an immediate adverse effect on the administration of a bankrupt estate and because such motions are often interposed for tactical purposes, as aforesaid. *Board of Educ. v. Nyquist,* 590 F.

1241, 1246 (2d Cir. 1979); *Lowenschuss, et al. v. Bludhorn, et al., supra.*

The Kurtz Objectants contend that WGM must be disqualified because they allegedly represented the Bank Claimants in their prosecution of their claims against Grant. The record establishes the contrary. WGM had no involvement in connection with Grant or with any Bank Claimant as to its claims against Grant until October 9, 1975—just five (5) days prior to that firm's engagement by the Creditors' Committee of the Grant estate. After the retention of WGM by the Creditors' Committee in the Chapter XI case, they specifically refused employment by any of the Bank Claimants in relation to the prosecution of claims against Grant. Throughout this case the Bank Claimants have been represented by other attorneys. Further, WGM's engagement by the Trustee is consistent with Section 44 of the Bankruptcy Act, 11 U.S.C. § 72 c, which provides:

An attorney shall not be disqualified to act as attorney for the receiver or trustee merely by reason of his representation of a general creditor.

See also Bankruptcy Rule 215(c).

The Kurtz Objectants also contend that the representation by WGM of certain banks, who are also Bank Claimants, pursuant to special engagements as to matters totally apart from the instant bankruptcy case, requires their disqualification. In this connection it is urged that WGM's representation of First Pennsylvania Bank, N.A. and Flushing Savings Bank in unrelated matters is sufficient to disqualify WGM even though institutions are not creditors of the bankrupt estate.

The Kurtz Objectants focus upon the special representation by WGM of Morgan Guaranty as a creditor in a separate and distinct Chapter XI case before another bankruptcy judge from February 1975 until April 4, 1977 as an absolute ground for disqualification. It is also asserted that WGM's role as co-counsel to the Chapter XI Creditors' Committee constitutes a disqualification factor.

■ This Court recently had the opportunity to review the factors to be considered in entertaining a motion to disqualify attorneys for a trustee in *In re REA Holding Corp.*, 4 Bankr.Ct.Dec. 1249 (S.D.N.Y.1979). The disqualification of both a trustee and his co-counsel was sought upon alleged conflicts of interest which prevented them from adequately representing the interests of the bankrupt estate. Among the alleged conflicts cited was the fact that the counsel for the trustee had represented the Creditors' Committee during the Chapter XI case that preceded an adjudication in bankruptcy and the retention of such counsel by the trustee. In considering that motion I was guided by the teachings of *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973). Emle admonishes courts to recognize their "responsibility to preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." 4 Bankr.Ct.Dec. at 1253 (citation omitted). Additionally, I noted the difficulties involved in evaluating the claims asserted in the perspective of the guidelines provided by *United States v. Standard Oil Company*, 136 F.Supp. 345, 367 (S.D.N.Y.1955), which states:

When dealing with ethical principles, it is apparent that we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts of precise application of precedent.

I concluded and reaffirm that "[t]he role of counsel to an official creditors' committee is not adverse to or in conflict with the role of counsel to a bankruptcy trustee if liquidation should subsequently ensue." 4 Bankr. Ct.Dec. at 1253.

■ As for the representation of a creditor of the bankrupt estate in an unrelated and distinct matter, such representation does not result in a *per se* disqualification of an attorney for a trustee. It has been the customary and accepted practice. *Cf.* Section 44 c of the Bankruptcy Act, *supra*, Bankruptcy Rule 215(c).[5] WGM has not represented any Bank Claimant in the prosecution of its claim against Grant. The Kurtz Objectants have failed to provide any evidence tending to establish any basis for disqualifying WGM as attorneys for the Trustee. I have reviewed the record and I am satisfied that the Trustee's attorneys have served him and the creditors of the bankrupt estate with vigor, objectivity and independence. I conclude that there exists no basis for the disqualification requested.[6]

■ It is alleged by the Kurtz Objectants that the hearing must be considered a nullity on the basis that the Trustee's attorney testified in connection with the merits of the Offer. This claim warrants no further consideration by the Court inasmuch as it has heretofore been addressed in *In re W. T. Grant Company*, 75 B 1735 (S.D.N.Y. Jan. 18, 1978). In that proceeding to which Mr. Kurtz was a party and Mr. Bader appeared, I concluded that the testimony of an attorney for the Trustee in relation to the consideration of a compromise and settlement is warranted and properly part of the record of such proceeding. The Kurtz

---

5. Codification of this customary and accepted practice is found in Section 327 of the Bankruptcy Code, 11 U.S.C. § 327, 92 Stat. 2549, 2563, which relates to the engagement of professionals. Section 327(c) states:

(c) In a case under chapter 7 [liquidation] or 11 [reorganization] of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, but may not, while employed by the trustee, represent, *in connection with the case*, a creditor.

Emphasis added.

6. It is noted that I. Walton Bader, an attorney for Mr. Kurtz, in a letter addressed to the court dated April 25, 1978, disassociated himself from Mr. Kurtz' position as to a conflict of interest on the part of WGM. He stated:

We wish to inform the Court that we do not support Mr. Kurtz' position in this matter, that Harvey Miller or the firm of Weil, Gotshal & Manges is not entitled to represent the Trustee before your Honor because of any alleged conflict of interest.

Objectants misconceive the nature of a hearing to consider a compromise and settlement. The evaluation of legal issues involved in the controversy is a material element to the consideration of a proposed compromise and settlement. Obviously, the claimed inability of a trustee's attorney to testify as to legal issues involved "would work a substantial hardship on the [trustee] because of the distinctive value of a lawyer or his firm as counsel in the particular case." Furthermore, this contention of the Kurtz Objectants is patently frivolous in light of the repeated statements made by their attorney of his intention to call the Trustee's attorney as a witness during the hearing. The contention is without merit and is rejected.

### (c) U.S. Trust and Its Attorneys.

■ The Kurtz Objectants have demonstrated no basis upon which it would be proper to disqualify U.S. Trust and its attorneys. I am satisfied that U.S. Trust has adequately represented the interests of the 4¾% Subordinated Debentureholders since the commencement of the bankrupt case. U.S. Trust and its attorneys actively participated in the investigation of the Bank Claimants by the Trustee. In connection with the compromise and settlement of the claims of Secured Suppliers of Grant, holders of Grant 4¾% Sinking Fund Debentures and the Bank Claimants; U.S. Trust was heavily involved. The assertion by the Kurtz Objectants that U.S. Trust is subject to disqualifying conflicts of interest because of other business relationships with Chase and one or more of the Bank Claimants is not substantiated by the record. There is no evidence that U.S. Trust has been negligent or otherwise deficient in the discharge of its responsibilities as Indenture Trustee for the 4¾% Subordinated Debentures. Disqualification of an Indenture Trustee and its attorneys may not be granted on the basis of unsupported and ephemeral assertions. Accordingly, the position of the Kurtz Objectants as to U.S. Trust and its attorneys is rejected.

■ I have considered all of the assertions made on behalf of the Kurtz Objectants. I find nothing in the record which would tend to support any of the assertions, contentions and charges which have been made by the Kurtz Objectants. They are without substance and should not serve to prejudice the interests of other Subordinated Debentureholders who by reason of the approval of the Offer will be afforded the opportunity to realize a recovery upon their claims. If the Offer becomes effective, up to approximately $14,000,000 will be distributed from the assets of the bankrupt estate for the benefit of Subordinated Debentureholders. The Offer provides material benefits to the creditors of the bankrupt estate, its acceptance would substantially contract any litigation of the sharply disputed issues of fact and law relating to the controversy and the administration of the bankrupt estate. In light of the probabilities of success the Offer is in the best interests of the bankrupt estate and its creditors. Accordingly, I approve the Offer and authorize its dissemination to Subordinated Debentureholders.

The Trustee is directed to proceed in accordance with the terms and provisions of the Offer, this Opinion and further to furnish to all known Subordinated Debentureholders (a) a copy of his application, as amended; (b) a copy of this Opinion; and (c) such other papers and documents as are contemplated by the Offer.

The foregoing constitutes the findings and conclusions of the Court in accordance with Bankruptcy Rule 752.

No finding of fact or conclusion of law made with respect to the Trustee's application, the application made by the Trustee and filed April 10, 1978 as to the compromise and settlement of the controversy with the Bank Claimants, or the Bank Settlement Agreement, or the testimony received at the hearings in connection with the applications shall be admissible in evidence for any purpose other than for purpose of impeachment, in any subsequent action or proceeding if the Offer does not become

effective or concerning the rights of non-accepting Subordinated Debentureholders.

IT IS SO ORDERED.